IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LISA BAILY,                        :       Civil Action No. 02CV5153
                                   :
                    Plaintiff,     :
                                   :
            v.                     :
                                   :
AETNA INC.,                        :
                                   :
                    Defendant.     :

<u>ORDER</u>

AND NOW, this            day of                    , 2003, IT IS ORDERED

that Defendant Aetna Inc.'s Motion for Summary Judgment is hereby GRANTED.  Judgment is

entered in favor of Defendant Aetna Inc. on all counts of Plaintiff's Complaint, and Plaintiff's

Complaint is dismissed, with prejudice.

_____
                                                              J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LISA BAILY,                          :        Civil Action No. 02CV5153
                                     :
                    Plaintiff,       :
                                     :
             v.                      :
                                     :
AETNA INC.,                          :
                                     :
                    Defendant.       :

DEFENDANT AETNA INC.'S
MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Aetna

Inc. ("Defendant"), hereby moves for summary judgment on all claims in Plaintiff's Complaint.

This motion incorporates by reference the attached Memorandum of Law.  For the reasons set

forth in the attached Memorandum of Law, Defendant respectfully requests that its Motion for

Summary Judgment be granted and that judgment be entered in its favor on all claims in

Plaintiff's Complaint, with prejudice.

Respectfully submitted,


/s/ Jill Garfinkle Weitz
JILL GARFINKLE WEITZ
KLETT ROONEY LIEBER & SCHORLING
A Professional Corporation
Two Logan Square, 12th Floor
Philadelphia, PA 19103
(215) 567-7500

Attorneys for Defendant
Aetna Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LISA BAILY,                          :      Civil Action No. 02CV5153
                                     :
            Plaintiff,               :
                                     :
       v.                            :
                                     :
AETNA INC.,                          :
                                     :
            Defendant.               :

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT AETNA INC.'S
MOTION FOR SUMMARY JUDGMENT

I.    INTRODUCTION

        Plaintiff Lisa Baily ("Plaintiff"), a former employee of Aetna Inc. ("Aetna" or "the

Company"), has instituted this action against Aetna, in which she asserts claims against the

Company for allegedly violating the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601,

et seq. ("FMLA").  Specifically, Plaintiff asserts claims for FMLA interference and retaliation,

stemming from events in late July and August 2001, during which time she sought and received

a leave of absence based upon her alleged disability and eventually, voluntarily resigned her

employment.  Based upon the undisputed evidence in this case, consisting almost entirely of

Plaintiff's admissions, Aetna is entitled to summary judgment on Plaintiff's FMLA claims.

Accordingly, Aetna respectfully requests that summary judgment be granted in its favor on

Plaintiff's Complaint in its entirety.

II.   STATEMENT OF UNDISPUTED FACTS

      A.    Plaintiff's Initial Hiring By Aetna And The Benefits Available
            Throughout Her Employment With The Company.

        Plaintiff was hired by Aetna in 1996 in a clerical position at its Allentown,

Pennsylvania facility.  (Ex. A, Pl. Dep. at 7).   Approximately six months later, she was trained

as a claims processor and assigned to Unit 73, a unit which primarily processed benefit claims

for Aetna companies.  (Ex. A, Pl. Dep. at 8-10).  When Plaintiff was first assigned to Unit 73,

her supervisor (team leader) was Joann McPeak.  (Ex. A, Pl. Dep. at 9).  When McPeak retired

in or about January 2001, Theresa Day was promoted from being a claims processor in Unit 73

to its team leader. (Ex. A, Pl. Dep. at 11-12, 17-18).

    Plaintiff admits that she was given a number of employee handbooks during her

employment with Aetna, which included information concerning the Company's policies and

procedures, including its Family and Medical Leave Act ("FMLA") and short term disability

("STD") policies.  (Ex. B, 1997 Handbook, at p. 16; Ex. C, 1999 Handbook, at p. 16; Ex. A, Pl.

Dep. at 15, 17).[1]  The handbooks were also available on-line, though Aetna's Intranet (called

"AETNET"), which was available to all employees, including Plaintiff, in 2001 (and before).  (Ex.

E, On-Line Sections of Aetna Handbooks Relating To Benefits in 2001; Ex. F, Williams Dep. at

24-27).[2]  In addition, each year Aetna distributed to its employees (and Plaintiff received) copies

of its benefits booklet, entitled "A Part of Life, Aetna Benefits" (including 2001), and these

booklets also contained information concerning the Company's FMLA and STD policies.  (Ex.

G, 1999, 2000 and 2001 "A Part of Life" Booklets; Ex. A, Pl. Dep. at 12-13).  Plaintiff admits that

she received these benefit booklets.  (Ex. A, Pl. Dep. at 12-14).  Aetna also made available the

summary plan descriptions ("SPD") of all of its employee benefits, including its FMLA and STD

policies, on AETNET.  (Ex. H, SPDs for FMLA and STD from 2001; Ex. F, Williams Dep. at 24-

27).  In addition, Plaintiff received an orientation regarding benefits when she was first hired,

---

    [1]Plaintiff signed an Acknowledgment of Receipt of the 1997 Handbook.  (Ex. D).
Plaintiff maintained a copy of the 1999 Handbook at home, which she produced during
discovery in this action.  (Ex. A, Pl. Dep. at 17).

    [2]Susan Williams, who currently holds the position of Employee Relations Team Leader,
was deposed by Plaintiff as Aetna's corporate designee with respect to Aetna's FMLA policy
applicable in June through August of 2001.  (Ex. F, Williams Dep. at 14).  In the summer of
2001, Ms. Williams  held the position of Employee Practices Consultant with Aetna.  (Ex. F,
Williams Dep. at 10).

and a human resources representative, Cynthia Karchner, worked in Aetna's Allentown facility in 2001 and was available to provide guidance on the Company's leave policies. (Ex. A, Pl. Dep. at 20; Ex. F, Williams Dep. at 14; Ex. I, March 11, 1996 New Hire Letter).[3]

Aetna's FMLA policy provides (and provided in 2001) its employees with family and medical leave protection greater than that required under federal law. Specifically, in 2001, Aetna employees who worked at least 1,000 hours in the previous year could obtain up to sixteen (16) weeks of family and medical leave protection. (Ex. F, Williams Dep. at 33; Ex. G, 2001 "A Part of Life," at p. 12-20; Ex. H, FMLA SPD).[4] Although all falling within the same entitlement of 16 weeks of FMLA protection, in terms of processing benefits requests by its employees, Aetna distinguished between leave taken for an employee's own serious health condition, referred to as Employee Medical Leave ("EML"); maternity leave or leave taken for the care of a newborn or adopted baby, referred to as Family Leave ("FL"); and leave taken to care for the serious health condition of a family member, referred to as Family Medical Leave ("FML"). (Ex. G, at 2001 "A Part of Life," at p. 13-14; Ex. H, FMLA SPD). This processing claims distinction was explained in detail in the benefits booklet distributed to employees, as well as on AETNET. (Ex. G 2001, "A Part of Life," at 12-20; Ex. H, FMLA SPD).

In addition to the generous 16 weeks of family and medical leave policy, Aetna also provided STD to eligible employees in 2001, as again explained in detail in the handbooks, benefit booklets and the AETNET. (Ex. F, Williams Dep. at 28-31; Ex. G, 2001 "A Part of Life," at p. 4-8; Ex. H, STD SPD). In order to apply for STD in 2001, an employee was required to call an Aetna benefits hotline (the toll free number was posted throughout Aetna and in its

---

[3]Indeed, Plaintiff signed a Statement of Responsibility, acknowledging that it was her responsibility to keep herself abreast on changes to Aetna's benefits, policies and procedures. (Ex. J, Statement of Responsibility).

[4]Throughout the remainder of this brief, Aetna will cite only to the 2001 "A Part of Life" benefits booklet, since the events in this case allegedly occurred in August 2001.

3

handbook and benefits booklet), and speak to a claims processor at Total Health And Disability Services ("THD"). (Ex. F, Williams Dep. at 28-29; Ex. G, 2001 "A Part of Life," at p. 5; Ex. H, STD SPD, at p. 3-4).[5] The employee's medical provider would be required to provide evidence to THD substantiating that the employee was unable to perform her job. (Ex. G, 2001 "A Part of Life," at p. 4). The burden was on the employee to provide such medical information. (Ex. G, 2001 "A Part of Life," at p. 4). An employee's supervisor had no involvement in the claims processing of its employee's STD request. (Ex. F, Williams Dep. at 28-30; Ex. G, 2001 "A Part of Life," at 14).

Pursuant to Aetna's policies (again as set forth in the booklets, handbooks, and SPD's), where an employee applied for STD, there was no need for the employee to apply for EML (or FMLA) at the same time. (Ex. F, Williams Dep. at 29; Ex. G, 2001 "A Part of Life," at p. 14). Specifically, where an employee was granted STD benefits, the employee's leave time would automatically be designated as EML (or FMLA) protected, as long as the employee was otherwise eligible for such protection (i.e., she worked at least 1,000 hours in the preceding year and had not otherwise utilized her 16 weeks of available time). (Williams Dep. at 29, Ex. G, 2001 "A Part of Life," at 14).[6] Thus, as explained to employees in 2001, where an employee applies for STD, there is no requirement that she file a separate request for FMLA, because the STD request is sufficient for both purposes. (Ex. F, Williams Dep. at 29; Ex. G, 2001 "A Part of Life," at 14).

As also explained in Aetna's benefits materials, where an employee's STD claim is denied, she may then file a separate claim for EML (or FMLA), since the standard for EML

---

[5]THD, located in Portland, Maine, is a subsidiary of Aetna Inc., which provides disability claims processing services for Aetna, as well as non-Aetna companies. (Ex. F, Williams Dep. at 27).

[6]The employee's supervisor makes this numbers-based eligibility determination. (Ex. G, 2001 "A Part of Life," at 14).

benefits is less stringent than that under the Company's STD policy. (Ex. F, Williams Dep. at 32-33; Ex. G, 2001 "A Part of Life," at p. 14). However, while an employee's STD claim, period for appeal of denial of STD claim, and/or appeal of denial of STD claim are pending, Aetna will not take any job action against the employee. (Ex. F, Williams Dep. at 34-35).

      B.      **Theresa Day Becomes Unit 73's Supervisor And Plaintiff Has Problems Getting Along With A Co-Worker.**

Plaintiff admits that from January through mid-July 2001, she personally did not have any problems with Day, but she observed issues concerning Day's supervision of other employees. (Ex. A, Pl. Dep. at 21-22). For example, early in her new position, Day erroneously provided all of her subordinates' monthly results where an individual processor asked to see her own results, since Day did not know how to bring up an individual's results on the computer system. (Ex. A, Pl. Dep. at 26-27). This issue, however, "did not concern" Plaintiff, and the conduct ceased after another employee discussed it with Day. (Ex. A, Pl. Dep. at 24-26). Plaintiff also believed Day played favorites with some of the processors. (Ex. A, Pl. Dep. at 28, 31-33). Plaintiff never complained to anyone about these concerns. (Ex. A, Pl. Dep. at 25).

In mid to late July 2001, Plaintiff began to have problems getting along with a co-worker, Edith Taylor, who sat next to Plaintiff. (Ex. A, Pl. Dep. at 34-35). Specifically, Plaintiff was bothered by the fact that Taylor wore heavy perfume, which Taylor would at times spray in her own work area. (Ex. A, Pl. Dep. at 34). Plaintiff never discussed the perfume issue directly with Taylor, and she believes that when she spoke to Day about it, Day did not deal with the issue. (Ex. A, Pl. Dep. at 34-36). However, Plaintiff admits that she does not know whether Day spoke to Taylor about the perfume use. (Ex. A, Pl. Dep. at 34-36). Plaintiff was also annoyed that in late July 2001, Taylor and other co-workers engaged in loud personal conversations near Plaintiff's work area. (Ex. A, Pl. Dep. at 41-43).

5

On Thursday, July 26, 2001, Plaintiff sent an e-mail to Warren Furry, Day's supervisor, complaining about Taylor's perfume and the loudness of the unit. (Ex. A, Pl. Dep. at 36-37; Ex. K, E-Mail Message). Furry immediately responded to the e-mail on Monday, July 30, 2001 (his next day in the office), and met with Plaintiff about her concerns the next day. (Ex. A, Pl. Dep. at 37-38; Ex. K). Specifically, on July 31, 2001, Plaintiff discussed the perfume issue and the loudness of the unit with Furry, as well as the fact that she believed that Day gave information concerning employees to other employees and her speculation that Day had discussed her e-mail complaint with other processors. (Ex. A, Pl. Dep. at 47).[7] Plaintiff asked Furry to move her to another unit, and Furry said that he would look into her request. (Ex. A, Pl. Dep. at 47, 49). Furry also advised Plaintiff that he had already addressed her concerns with Ms. Day. (Ex. A, Pl. Dep. at 40).

A few days after sending the e-mail to Furry (but before her meeting with Furry) Plaintiff believes Day on one occasion gave her a "nasty look" and grabbed her worksheet from her. (Ex. A, Pl. Dep. at 46). Plaintiff admits that Day did not say anything inappropriate to her. (Ex. A, Pl. Dep. at 46). In addition, Plaintiff claims later on July 31, 2001, after she asked to be transferred, Day stated in a loud voice that she "didn't care if she lost one of her best processors." (Ex. A, Pl. Dep. at 50-51). Later that day, when Plaintiff was getting ready to leave, she allegedly heard Taylor state that she "felt like smacking someone." (Ex. A, Pl. Dep. at 51). Plaintiff then signed out and left work, with no more interaction with anyone from the unit. (Ex. A, Pl. Dep. at 51-52).

Later that same evening, Heather Roche (a fellow employee who was also having problems getting along with her co-workers) called Plaintiff at home. (Pl. Dep. at 53). They decided that since they both had issues with Taylor, they did not know to whom she

---

[7]Plaintiff admits that she has no direct knowledge that Day actually discussed the e-mail complaint with her fellow employees. (Ex. A, Pl. Dep. at 49).

6

addressed the "smacking" comment. (Ex. A, Pl. Dep. at 53). On the morning of August 1,

2001, Plaintiff and Roche went to see Furry to tell him what Taylor had said. (Ex. A, Pl. Dep. at

54). Furry advised Plaintiff and Roche to make a complaint with the human resources

department, which they did later that morning. (Ex. A, Pl. Dep. at 54-56). Since the human

resources representative at the Allentown facility was out of the office that day, Susan Williams

met with both Plaintiff and Roche separately, for approximately one-half hour each. (Ex. A, Pl.

Dep. at 57-58; Ex. F, Williams Dep. at 15-16, 18). Plaintiff informed Williams about the issues

she was having with Day and that she did not feel safe working next to Taylor because of the

statement she had made. (Ex. A, Pl. Dep. at 57-58). After hearing their complaint, Williams

sent both women home for the day (after obtaining approval from Furry) and advised them that

a human resources representative from the Blue Bell, Pennsylvania facility would be contacting

them at home. (Ex. A, Pl. Dep. at 59; Ex. F, Williams Dep. at 15-16).

　　　　　Later on August 1, 2001, Kym Ebert, a human resources representative from the

Blue Bell facility, telephoned Plaintiff at home to investigate Plaintiff's complaint. (Ex. A, Pl.

Dep. at 59). Plaintiff told Ebert that she was on the other line and that she had no other

information to provide. (Ex. A, Pl. Dep. at 59, 67-68). Plaintiff admits that she was on the other

telephone line with Roche, preparing a detailed written complaint of her issues with Taylor and

Day, which Roche then provided to Aetna. (Ex. A, Pl. Dep. at 69; Ex. L, August 1, 2001 Written

Complaint). Plaintiff admits that the August 1, 2001 internal complaint sets forth in full her

issues within Unit 73, and that the issues addressed in the August 1, 2001 complaint were the

same issues she had already discussed with Furry, Williams and Ebert. (Ex. A, Pl. Dep. at 60,

66). Plaintiff believes that Roche gave the written complaint to Furry on August 1 or 2, 2001.

(Ex. A, Pl. Dep. at 66-67).

　　　　　On August 2, 2001, Ebert again called Plaintiff at home, advising her that Furry

would be calling her to come into the Allentown facility to discuss her issues. (Ex. A, Pl. Dep. at

68-70).  Furry called Plaintiff later than morning, and they met later that day.  (Ex. A, Pl. Dep. at 71).  Furry advised Plaintiff that she was going to be moved to a different unit, under the supervision of Patricia Maroun, with whom Plaintiff had worked before with no problems.  (Ex. A, Pl. Dep. at 71).  Furry explained the results of Ebert's investigation to Plaintiff, including that since Taylor did not address her statements to a particular individual (and Plaintiff admitted that she was unsure whether it was directed at her), Aetna could not conclude that Taylor made a threat to Plaintiff.  (Ex. A, Pl. Dep. at 70-71).  Furry also explained that during Ebert's investigation, she spoke to other employees in Unit 73.  (Ex. A, Pl. Dep. at 72-73).

Plaintiff advised Furry on August 2, 2001 that she had a doctor's appointment that day, and that her doctor may be putting her on disability leave.  (Ex. A, Pl. Dep. at 71).  Furry then provided Plaintiff with the hotline number of THD.  (Ex. A, Pl. Dep. at 71, 84-85).

C.    Plaintiff Applies For STD Benefits On August 2, 2001 And Never Comes Back To Work.

On August 2, 2001, Plaintiff called the hotline number Furry provided to her and made a claim for STD.  (Ex. A, Pl. Dep. at 84-85).  Also on August 2, 2001, Plaintiff visited her primary physician, Dr. Scott Sterling, complaining of stress from her job, headaches and dizziness.  (Ex. A, Pl. Dep. at 74; Ex. M, Northern Valley Primary Care Records, at p. 2).  Plaintiff had a long history of migraine headaches, as well as dizziness, for years prior to August 2001.   (Ex. A, Pl. Dep. at 74-75; Ex. M, at p. 4, 8).  Dr. Sterling sent Plaintiff for a CAT scan, which she had on August 7, 2001, with normal results.   (Ex. A, Pl. Dep. at 75, 78; Ex. M, at p. 5).  Plaintiff spoke to Dr. Sterling's office on August 6, 2001, informing the office that she was now feeling "okay."  (Ex. A, Pl. Dep. at 78; Ex. M, at p. 2).

Plaintiff's STD claim was processed by THD in Portland, Maine.  Plaintiff's physician's office would not release medical information to THD, and thus, on August 6, 2001, Plaintiff was informed that she must provide her primary care physician with an authorization to

8

release her medical information and have the physician send, via facsimile, her medical information relating to her disability to THD.    (Ex. A, Pl. Dep. at 86-87; Ex. N, THD Log).[8] Under the STD policy, once the medical information was received by THD, it had up to five (5) days to process the claim.    (Ex. N, THD Log).

THD did not receive Plaintiff's medical information from Dr. Sterling's office, and therefore, Plaintiff's STD request was originally denied on August 10, 2001.  (Ex. A, Pl. Dep. at 87; Ex. O, August 10, 2001 Certification Decision).  Plaintiff testified that she was told by her physician's office that her medical information had been faxed to THD, but since it was never received, she had to have Dr. Sterling's office re-fax it on or about August 14, 2001.   (Ex. A, Pl. Dep. at 88-89; Ex. N, THD Log).  Plaintiff admits that during this period between August 2 and 14, 2001, she remained an Aetna employee an that she continued to receive her Aetna benefits.  (Ex. A, Pl. Dep. at 89).

On August 20, 2001, Plaintiff's claim for STD benefits was certified from August 2, 2001 through August 7, 2001, the only period of disability reflected in Dr. Sperling's records, since (as explained to Plaintiff) the note in his records on August 6 stated that she was "okay" and her CAT scan on August 7, 2001 was normal.  (Ex. A, Pl. Dep. at 92; Ex. N, THD Log). Plaintiff received a Certification Decision from THD, explaining the STD benefits which were certified, the reasons benefits were denied past August 7, 2001, her appeal rights, her right to submit additional information for recertification past August 7, 2001, and an explanation that Aetna will determine whether her alleged disability can be considered under the FMLA.  (Ex. A, Pl. Dep. at 92; Ex. P, August 20, 2001 Certification of Benefits).

In August, 2001, Plaintiff, through Aetna's employee assistance program, met with Shonda Bear Moralis, a therapist, due to the alleged stress she experienced in July and

_____

[8]The "THD Log" is a print-out of activity on Plaintiff's STD claim.

9

August 2001. (Ex. A, Pl. Dep. at 80-81; Ex. Q, Letter from S. Moralis, dated August 23, 2001).

Plaintiff's first appointment with Ms. Moralis was on August 13, 2001. (Ex. Q). She met with

the therapist two additional times, on August 24 and 31, 2001. (Ex. Q; Ex. R, Mental Health

Provider Statement and Fax Cover Sheet). Plaintiff explained her discussions with Ms. Moralis

as follows:

> A.    I discussed with her all the issues that were going on at the time; the
>       problems that I had with human resources with the disability. They had
>       denied the disability because they somehow didn't get the fax that my
>       primary care physician had faxed to them. Somehow they said that they
>       never received it, even though it was faxed by my primary care physician.
>       I discussed with her how stressed out that that made me because then I
>       had to go through the hassle of having it re-faxed again.
>
> Q.    Anything else that you discussed with Ms. Bear Moralis?
>
> A.    Just how I was feeling at the time because of everything that had
>       happened.
>
> Q.    What everything?
>
> A.    As far as with the harassment between Theresa Day and Edith Taylor,
>       and just my feelings, you know, how upset that got me because of how I
>       was being treated at work.
>
> Q.    Anything else you recall discussing with Ms. Bear Moralis?
>
> A.    At the moment, I can't recall any.

(Ex. A, Pl. Dep. at 82-83). Plaintiff never met with Ms. Morales after August 31, 2001. (Ex. A,

Pl. Dep. at 80).

After her STD benefits were denied past August 7, 2001, Plaintiff attempted to

have her benefits extended past that date because of her "stress" and the therapy she was

seeking for the stress. (Ex. A, Pl. Dep. at 93). THD informed Plaintiff that in order to have her

STD benefits extended, her physician would have to provide additional medical information.

(Ex. A, Pl. Dep. at 93). Plaintiff sought to provide Ms. Moralis' reports as the medical

information to support her continued STD benefits. (Ex. A, Pl. Dep. at 94). Ms. Moralis also

had to provide her reports to THD twice because her first report was lost. (Ex. A, Pl. Dep. at 94).

During this period in late August 2001, Plaintiff and her husband called THD frequently with respect to her STD claim, and they were given detailed explanations of the process. (Ex. A, Pl. Dep. at 95-97; Ex. N, THD Log). Plaintiff admits that she also consulted her Aetna handbook and benefits booklets regarding the STD policy. (Ex. A, Pl. Dep. at 106). She did not apply for EML (or FMLA) protection during this time, nor did she check her handbook or benefits booklets concerning these benefits. (Ex. A, Pl. Dep. at 106). Plaintiff also did not call the Allentown facility's human resources representative concerning EML or FMLA leave. (Ex. A, Pl. Dep. at 98-99). Importantly, throughout all of August 2001, Plaintiff's job was not affected in any way – she continued to be employed by Aetna, her position was held open, and her benefits continued without interruption. (Ex. A, Pl. Dep. at 89, 98, 103-04).

Meanwhile, sometime after August 10, 2001, Maroun telephoned Plaintiff at home and informed her that she would be her new supervisor when Plaintiff returned to work. (Ex. A, Pl. Dep. at 111-12). Plaintiff and Maroun discussed that Plaintiff's initial STD claim had been denied, and Maroun asked Plaintiff to keep her informed of the status of her disability claim. (Ex. A, Pl. Dep. at 111-12). On August 21, 2001, after Plaintiff's STD benefits were not certified past August 7, 2001, Maroun sent Plaintiff a notice of her eligibility for benefits under Aetna's FMLA policy. (Ex. S, August 21, 2001 Memorandum from P. Maroun).[9]

Plaintiff had no further contact with Maroun until after she received the August 20, 2001 Certification Decision in or about the last week of August 2001. (Ex. A, Pl. Dep. at

---

[9]Plaintiff testified that she never received a copy of the August 21, 2001 memorandum, which was in her personnel file. (Ex. A, Pl. Dep. at 93). The fact that she denied receiving the memorandum, however, does not create a genuine issue of material fact, since it is undisputed that Plaintiff's FMLA rights were otherwise fully explained in the various handbooks, benefit booklets, and STD's which Plaintiff admits she received and did not review. (Ex. A, Pl. Dep. at 106).

11

112-13). At that time, Maroun called Plaintiff at home and informed her that since her STD benefits had not been approved past August 7, 2001, she should call Maroun each day to inform her whether she was coming to work. (Ex. A, Pl. Dep. at 113-14). Maroun informed Plaintiff that she was only required to leave a voice mail message and need not speak to Maroun directly. (Ex. A, Pl. Dep. at 115-16). Plaintiff testified that she called in every day from the date of the conversation until August 30, 2001 (approximately 7 days), and except on one occasion, left a voice mail message for Maroun, rather than speaking to the supervisor directly. (Ex. A, Pl. Dep. at 115-16).

On the one occasion where she actually spoke to Maroun, Plaintiff had called in the afternoon, rather than the morning, to state that she would not be coming to work that day, and Maroun allegedly "rudely" told Plaintiff that she must call in the morning. (Ex. A, Pl. Dep. at 108-09). Plaintiff admits that this single conversation with Maroun and the fact that she had to leave voice mail messages for a one-week period are the entire basis for her Complaint allegations that Maroun "harassed" her. (Ex. A, Pl. Dep. at 108-110). Plaintiff admits that Maroun never raised her voice to Plaintiff at any time and that Maroun never threatened Plaintiff or her job in any way. (Ex. A, Pl. Dep. at 116-17).

Significantly, Plaintiff admits that Maroun never actually supervised Plaintiff, since she never came back to work while Maroun was her supervisor. (Ex. A, Pl. Dep. at 72, 116-17).[10] Indeed, Plaintiff admits that other than her contact with Maroun and THD, she had

---

[10]Interestingly, this admission directly contradicts paragraphs 11 and 12 of Plaintiff's Complaint, where Plaintiff alleged:

11.    The Plaintiff was out of work on 8/02/01 until 8/31/01. Upon her return to work, the Plaintiff continued to be harassed by her supervisor, Patricia Maroun, regarding the problem which had precipitated the Plaintiff's need to take FMLA leave.

12.    The Plaintiff believes, and therefore avers, that the harassment she was

(continued...)

12

no contact with anyone at Aetna after August 2, 2001.  (Ex. A, Pl. Dep. at 117).  Plaintiff never

returned to work after August 2, 2001.  (Ex. A, Pl. Dep. at 72).

    D.    Plaintiff Voluntarily Resigns Her Employment At The End Of
           August, 2001.

        Plaintiff admits that after August 21, 2002, while she was continuing to press her

STD claim stating that she was unable to work, she was also actively searching for another job.

(Ex. A, Pl. Dep. at 126).  During this period, she applied for and was interviewed for positions

with Sperion, a temporary agency, and PMA Insurance Company ("PMA").  (Ex. A, Pl. Dep. at

126-30).  During her interview at PMA, Plaintiff stated that she was leaving Aetna because she

"was not satisfied with working there."  (Ex. A, Pl. Dep. at 126).  She eventually accepted a

position with PMA during the last ten days of August 2001.  (Ex. A, Pl. Dep. at 125).

        On August 30, 2001, Plaintiff called Maroun and told her that she would be

coming in the following day to resign.   (Ex. A, Pl. Dep. at 120-21).  On August 31, 2001,

Plaintiff provided a written resignation, which stated:

> To whom it may concern:
>
> I, Lisa Baily, am hereby handing in my resignation to Aetna US
> Healthcare after being constructively discharged from the
> company.  I being [sic] mentally harassed, belittled and humiliated
> and being forced to work in conditions that are not standard
> quality.  From day one of being out on medical disability I was
> denied benefits and still to this day I have not received any, in
> conjunction with that I have complied with every request and
> followed every procedure there is in order for me to get my
> benefits to no avail.  This has also added extra stress and anxiety
> to the matters at hand.  Due to these situations I can no longer

---

[10](...continued)
> experiencing <u>on the job</u> affected her health, to the point where she felt a
> need to request possible additional leave from the Defendant's Human
> Resources Department.

(Compl. at ¶ 11, 12) (emphasis supplied).

work under these conditions.  It would have been nice if we could
have worked these issues out in a more professional manner that
everybody would have been happy with but since could not have
been achieved [sic] please accept my resignation in it's [sic] place.

Sincerely,

Lisa Baily

(Ex. A, Pl. Dep. at 121; Ex. T, Resignation Letter).  Significantly, when questioned at her

deposition regarding the reasons set forth for her resignation in the August 31 letter, Plaintiff

stated that all of her issues (other than the delay in benefits) were related to her problems with

Day and Taylor in late July, 2001 – prior to and unrelated to her leave of absence.  (Ex. A, Pl.

Dep. at 122-25).[11]  Plaintiff admitted:

Q.    You also stated in the second sentence, "I am being mentally harassed."
       Do you see that?

A.    Yes.

Q.    How were you mentally harassed?

A.    With Theresa Day and Edith Taylor, I felt like I was being harassed when
       I was there.

Q.    You also state, "I am belittled and humiliated."  How were you belittled?

A.    I guess you can say because of the way they did it.  They said it loudly
       enough so that everybody could hear.

Q.    They meaning who?

A.    Edith Taylor and Theresa Day.  I felt like, you know, with other coworkers
       that -- I'm trying to think of the right words of how to say what I want to
       say.  I felt like because they were harassing me that everybody else was
       looking at me because of the situation.

Q.    You say that you were humiliated.  What do you mean by that?

-----

[11]Indeed, after August 1, 2001, Plaintiff had no contact with Day or Taylor.  (Ex. A, Pl.
Dep. at 117).

14

A.    Well, because of the situation with them and the things that they were saying and doing, I basically felt like everybody was turning against me, and because it was done in front of the area that our office space is in. It's a big open area. If you say things loud enough, you can hear things pretty far in the area, so, to me, other coworkers were looking at me and thinking I'm a bad person because of the way they were acting toward me.

Q.    You also state that you were being forced to work in conditions that are not standard quality. What did you mean by that?

A.    Because of them, especially being a supervisor and not acting professional.

Q.    Meaning Theresa Day?

A.    Yes.

Q.    So when you said it's because of them, you're talking about Edith Taylor and Theresa Day?

A.    Yes.

Q.    In your last sentence you say, "It would have been nice if we could have worked these issues out in a more professional manner that everybody would have been happy with, but since could not have been achieved, please accept my resignation in its place." What do you mean by "could have worked these issues out in a more professional manner that everybody would have been happy with"?

A.    Especially if the supervisor would have acted more professionally, none of this would have happened.

Q.    Which supervisor?

A.    Theresa Day. If she would have acted like a professional, because she was very unprofessional like a child, none of this would have happened.

(Ex. A, Pl. Dep. at 122-25). Plaintiff admits that no one at Aetna ever asked her to resign. (Ex. A, Pl. Dep. at 121). In addition, Plaintiff admits that she only used the term "constructive discharge" in her resignation letter because her attorney instructed her to use the phrase, and she did not know what it meant. (Ex. A, Pl. Dep. at 122). Interestingly, the date of Plaintiff's resignation, August 31, was the Friday prior to Labor Day weekend of 2001, and Plaintiff commenced working at PMA on September 4, the day after Labor Day. (Ex. A, Pl. Dep. at

15

125-26).  Plaintiff testified that she was able to work at PMA the first workday after her

resignation from Aetna because she knew she would not be "harassed" by her co-workers

there, as she had been "harassed" by Taylor and Day in Unit 73.  (Ex. A, Pl. Dep. at 126-27).

> E.    Plaintiff Received STD And FMLA Approval, And Received Full
> Salary And Benefits Through The Date of Her Resignation.

After she resigned from Aetna and while working at PMA, Plaintiff continued to

seek STD benefits from Aetna for the period of August 8 through August 31, 2001.  (Ex. N,

THD Log).  Plaintiff claimed STD benefits, based upon records submitted by Ms. Moralis on

September 14, 2001.  (Ex. R, Mental Health Provider's Statement and Fax Cover Sheet, dated

Sept. 14, 2001; Ex. N, THD Log).[12]  After Ms. Moralis' records were received on September 17,

2001, Aetna, pursuant to its STD policy, had 5 days to make a determination as to Plaintiff's

qualification for benefits.   (Ex. N, THD Log).  Ms. Moralis' records, however, did not support a

disability determination, since she specifically stated that she "does not usually sign off on client

for disability" and did not complete significant portions of the certification form provided to her.

(Ex. R, Fax Cover Sheet; Ex. N, THD Log).

Since Plaintiff continued to seek STD benefits, THD again contacted Dr. Sterling

on September 20, 2001, who stated that he had not seen Plaintiff since August 20, 2001, and

that he would not make a recommendation regarding how long she should be out of work.  (Ex.

N, THD Log).  Giving Plaintiff the benefit of the doubt since it had no medical information to

support a disability, THD made a determination that (based upon the fact that Plaintiff was last

seen by Dr. Sterling on August 20) a reasonable duration of disability would be through August

---

[12]Ms. Moralis' August 23, 2001 letter was determined insufficient to support a disability
finding past August 7, because the letter did not reference any disabling condition, objective
findings, referral to a psychiatrist or treatment with medication, all of which was explained to
Plaintiff.  (Ex. Q, August 23, 2001, Letter from S. Moralis; Ex. N, THD Log; Ex. U, Certification
Decision, dated Sept. 5, 2001).  On September 5, 2001, THD sent Ms. Moralis a Mental Health
Provider's Statement, which Ms. Moralis allegedly faxed back on September 6, but which THD
did not receive.  (Ex. R, Fax Cover Sheet; Ex. N, THD Log).

31, 2001. (Ex. N, THD Log). Plaintiff was notified orally (through her husband) and in writing that her STD claim was approved from August 8, 2001 through August 31, 2001. (Ex. A, Pl. Dep. at 96-98; Ex. N, THD Log; Ex. V, Certification Decision, dated Sept. 21, 2001). Pursuant to Aetna's policy, Plaintiff's leave from August 8 to August 31, 2001 was then designated as FMLA protected.

Plaintiff readily admits that she remained employed in the same job and received all of her pay and benefits from Aetna through and including the date of her resignation, August 31, 2001. (Ex. A, Pl. Dep. at 98, 132). Plaintiff admits that Aetna owes her no money, that she sustained no out of pocket losses of any kind, and that her health benefits and other benefits were never stopped by the Company prior to her resignation. (Ex. A, Pl. Dep. at 103-04). Plaintiff also admits that she received all of the STD leave to which she was entitled. (Ex. A, Pl. Dep. at 98). Indeed, Plaintiff admits that Aetna owes her no money whatsoever, and that the only "injury" which she allegedly suffered is the stress from having to ask her physicians to re-fax their records on two occasions because THD "misplaced" the paperwork. (Ex. A, Pl. Dep. at 118-19).

After her resignation and pursuant to the direction of her attorney, Plaintiff submitted an FMLA request to Aetna, which was back-dated to the date of her resignation. (Ex. A, Pl. Dep. at 99, 101, 104; Ex. W, FMLA Request). Aetna received Plaintiff's FMLA request on September 10, 2001, and since she had resigned, it was rejected by the Company. (Ex. A, Pl. Dep. at 104; Ex. W, FMLA Leave Request). Plaintiff claims that she sent the belated FMLA certification because, despite the numerous booklets and handbooks in her possession and the benefits certifications which she admitted she received, she was unaware of her FMLA rights. (Ex. A, Pl. Dep. at 105-06). Plaintiff readily admits that at no time in August 2001, including when she applied for STD on August 2, did she ever look at the FMLA or other leave policies Aetna had in place, as explained in her benefits booklet. (Ex. A, Pl. Dep. at 106).

17

Plaintiff also claims that she was given erroneous information from a person named "Grace" in Aetna's human resources department in late August 2001, since that Grace told her that she did not need to apply for EML or FMLA because she had applied for STD, and FMLA "doesn't pay anything. It's just getting certified so you don't get penalized." (Ex. A, Pl. Dep. at 107).[13] Plaintiff admits that she spoke to Grace while her STD benefits claim was still being reviewed, and that Grace told her that at the time "it was a disability claim, not a family and medical leave, so there was no need for me to fill [the FMLA leave request form] out." (Ex. A, Pl. Dep. at 105). Indeed, an entry on Aetna's "Peoplesoft" human resources computer tracking system, appears to reflect this conversation on August 30, 2001, and notes that the human resources representative informed Plaintiff that she need not apply for EML if STD is approved, referred Plaintiff to the STD, and sent Plaintiff an EML form. (Ex. X, Peoplesoft Entry, dated August 30, 2001; Ex. Y, EML Form, Produced by Plaintiff). Of course, regardless of the exact statements made by "Grace," there is no genuine issue of material fact, since while Plaintiff's STD claim was pending, Aetna's policy was to protect her job, that once her leave was certified for STD, her leave was automatically designated as FMLA-protected and Plaintiff suffered no detriment by failing to submit an FMLA leave request. (Ex. A, Pl. Dep. at 98, 103-04; Ex. F, Williams Dep. at 29, 34-35).

     F.    <u>Plaintiff Made Other Significant Admissions In Her Deposition.</u>

     1.    Plaintiff's only factual bases for her FMLA interference claim is that she had to ask Dr. Sterling and Ms. Moralis each to re-fax their records to THD on one occasion; that Maroun told her in late August (after Plaintiff received the August 20, 2001 Certification Decision) that her leave was not approved; and that Grace told Plaintiff in late August 2001

---

[13]Indeed, it is undisputed that Plaintiff was not "penalized," since her position in Maroun's unit was held open throughout her leave, she received full pay for her leave and her benefits remained in effect during her leave.

(while Plaintiff was seeking an extension of her STD benefits) that her claim was for disability, not FMLA.  (Ex. A, Pl. Dep. at 117-18, 125).

       2.    Plaintiff does not have any facts to support her FMLA retaliation claim. (Ex. A, Pl. Dep. at 120, 125).

       3.    Other than complaining about the fact that Dr. Sterling and Ms. Moralis each had to refax their medical information to THD and the delay in obtaining the extension of STD, Plaintiff never complained about her STD issues to anyone at Aetna (i.e., she did not file a claim with the Company's dispute resolution process or even complete the questionnaire provided to her to give feedback on her benefits claim experience).  (Ex. A, Pl. Dep. at 98-99).

III.   ARGUMENT

    A.   Summary Judgment Standard

       Summary judgment is appropriate where there is no genuine issue of material fact for resolution at trial and the moving party is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993).  The purpose of a motion for summary judgment is to avoid a useless trial.  See Cousins v. Yeager, 394 F. Supp. 595, 598 (E.D. Pa. 1975).  It enables the Court to "pierce and bare the pleadings in order to examine and assess the factual proofs to see if a trial is necessary."  Artman v. International Harvester Co., 355 F. Supp. 476, 481 (W.D. Pa. 1972).  Summary judgment is "no longer a disfavored procedural shortcut, and may present the district court with the first opportunity to dispose of . . . cases under the federal practice of notice pleading."  Big Apple BMW, 974 F.2d at 1362.

       In support of a motion for summary judgment, the moving party need not produce evidence to disprove the non-movant's claim, but must simply demonstrate the absence of any genuine issues of material fact.  See Big Apple BMW, 974 F.2d at 1362;

19

<u>Hollinger v. Wagner Mining Equip. Co.</u>, 667 F.2d 402, 405 (3d Cir. 1981). The burden then

shifts to the non-moving party to present legally admissible evidentiary matters showing a

disputed issue of material fact. <u>See</u> <u>Anderson</u>, 477 U.S. at 249; <u>Sunshine Books, Ltd. v.</u>

<u>Temple Univ.</u>, 697 F.2d 90, 96 (3d Cir. 1982). The non-movant may not rely on the allegations

set forth in her pleadings, but must set forth specific facts showing that there is a genuine need

for trial. <u>See</u> <u>Big Apple BMW</u>, 974 F.2d at 1363. If no such facts are presented by the non-

moving party, a grant of summary judgment in favor of the movant is warranted. <u>Id.</u>

      B.    The Undisputed Evidence Demonstrates That Summary
            <u>Judgment Is Warranted On Plaintiff's FMLA Interference Claim.</u>

         1.    Plaintiff is required to establish that Aetna's actions
               caused her to forfeit or lose the protections of the FMLA in
               <u>order to prevail on her FMLA interference claim.</u>

In order to prevail on an FMLA interference claim, a plaintiff must prove that the

defendant caused her to forfeit or lose the protections available under the Act. <u>See</u> <u>Alifano v.</u>

<u>Merck & Co., Inc.</u>, 175 F. Supp. 2d 792, 794-75 (E.D. Pa. 2001); <u>see</u> <u>also</u> <u>Graham v. State</u>

<u>Farm Mut. Ins. Co.</u>, 193 F.3d 1274, 1284 (11th Cir. 1999); <u>Bond v. Sterling, Inc.</u>, 77 F. Supp. 2d

300, 306 (N.D.N.Y. 1999). Significantly, federal courts uniformly hold that in order to satisfy this

requirement and establish an FMLA interference claim, a plaintiff must demonstrate some type

of <u>actual injury or harm</u> caused by the violation, such as actual money damages or the denial of

a benefit. <u>See</u> <u>Alifano</u>, 175 F. Supp. 2d at 795-96 (granting motion to dismiss on FMLA

interference claim where plaintiff did not allege defendant denied her entitlement to leave or

failed to restore her to previous position); <u>Lapham v. Vanguard Cellular Systems</u>, 102 F.

Supp.2d 266, 270 (M.D. Pa. 2000); <u>see</u> <u>also</u> <u>Sarno v. Douglas Elliman-Gibbons & Ives, Inc.</u>,

183 F.3d 155, 162 (2d Cir. 1999); <u>Summers v. Middleton & Reutlinger, P.S.C.</u>, 214 F. Supp. 2d

751, 758 (W.D. Ky. 2002); <u>Bond</u>, 77 F. Supp.2d at 306; <u>Dawson v. Leewood Nursing Home,</u>

<u>Inc.</u>, 14 F. Supp. 2d 828, 833-34 (E.D. Va. 1998). Claims for future lost wages, after the

termination of the employment relationship, do not satisfy this requirement.  See 29 U.S.C.

§2617; Lapham, 102 F. Supp. 2d at 269-70; Dawson, 14 F. Supp. at 832.

       For example, in Lapham, the plaintiff was taking intermittent leave from the

defendant-employer pursuant to the FMLA and was later lawfully terminated.  As in the present

case, the plaintiff in Lapham admitted that she received all monies and benefits owed to her

prior to cessation of her employment.  The plaintiff claimed that the defendant's interference

with her rights under the FMLA caused an aggravation of her medical condition, which

prevented her from seeking other employment, and she sought to recover wages from the date

of her dismissal until she secured another position.  The court granted summary judgment in

favor of the defendant, holding that the plaintiff could not recover damages for economic loss

incurred after she was lawfully terminated.

       Moreover, claims of alleged emotional distress also do not satisfy the "actual

injury" requirement of an FMLA interference claim.  Indeed, emotional distress damages are not

recoverable as a matter of law in FMLA interference actions.  See Graham, 193 F.3d at 1284;

Lloyd v. Wyoming Valley Health Care Syst., Inc., 994 F. Supp. 288, 291-93 (M.D. Pa. 1998)

(holding that emotional distress damages not recoverable under FMLA); Dawson, 14 F. Supp.

2d at 833-34.  Dawson is instructive.  There, the plaintiff claimed that the defendant's failure to

offer her the position she held previously when she returned from FMLA leave caused her to

suffer emotional distress.  The plaintiff admitted that she received full pay and benefits while

she was on the FMLA leave.  The court granted summary judgment for the employer, holding

that the plaintiff did not demonstrate a cognizable injury under the FMLA.  The Court reasoned

that damages for emotional distress are not recoverable under the FMLA:

> The statute itself gives an example of the type of damages that is
> recoverable when pay has not been denied, namely the cost of
> providing care. . . . [T]here is case law that stands for the
> proposition that damages for injuries related to emotional distress
> are not recoverable under the FMLA because "other

21

> compensation" means things that arise as a quid pro quo in the
> employment arrangement.  These decisions reason that
> Congress' decision to allow recovery under subsection (A)(i)(II)
> only for "actual monetary damages" reflects its intent to limit the
> amount of compensatory damages that a plaintiff could recover.

Dawson, 14 F. Supp. at 833-34 (quoting Lloyd, 994 F. Supp. at 291; Viscioso v. Pisa Bros., Inc.,

1998 WL 355415, at *4 (S.D.N.Y. 1998)).

Thus, federal courts routinely dismiss FMLA interference claims where a plaintiff

alleges that a technical violation of the FMLA occurred, but that no prejudice or damages

resulted, since the plaintiff in these cases has not satisfied the required element of proving that

she suffered some type of actual injury or harm, such that she forfeited or lost the protections of

the Act.  See, e.g., Burch v. WDAS AM/FM, 2002 WL 1471703 (E.D. Pa. June 28, 2002) (no

FMLA interference claim where employer failed to respond promptly to request for leave to care

for ill wife and supervisor called for overdue reports, since plaintiff received all leave and

benefits due him); Graham, 193 F.3d at 1284 (technical violation of FMLA in form of

memorandum erroneously sent to plaintiff stating she would be terminated if she missed more

work did not support interference claim since plaintiff never denied leave and plaintiff never

suffered actual damages); Sarno, 183 F.3d at 161-62 (no FMLA interference claim where

employer allegedly failed to provide plaintiff with required notice under FMLA, since plaintiff

received all leave and benefits entitled to under Act); Summer, 214 F. Supp. 2d at 757 (no

interference claim where employer retroactively designated plaintiff's FMLA leave and then

discharged her after 12 weeks of leave, since plaintiff suffered no injury or prejudice as a result

of retroactive designation since she received all leave and benefits entitled to under Act);

Santos v. Shields Health Group, 996 F. Supp. 87, 93-94 (D. Mass. 1998) (no interference claim

where plaintiff not injured by employer's failure to provide notice of designation of FMLA leave

since plaintiff received all benefits entitled to under Act).

Indeed, in <u>Ragsdale v. Wolverine World Wide, Inc.</u>, 112 S. Ct. 1155 (2002), the United States Supreme Court invalidated a Department of Labor regulation which would have required employers to grant employees more leave than that required under the FMLA where the employer did not technically comply with the Act by failing to provide notice of designation of FMLA leave. <u>Ragsdale</u>, 112 S. Ct. at 1161-62. In reaching its conclusion, the Court opined, in language directly applicable to the present case:

> To prevail under the cause of action set out in §2617, an employee must prove, as a threshold matter, that the employer violated §2615 by interfering with, restraining or denying his or her exercise of FMLA rights. Even then, §2617 provides no relief unless the employee has been prejudiced by the violation. . . .
>
>         *        *        *
>
> The challenged regulation is invalid because it alters the FMLA's cause of action in a fundamental way: It relieves employees of the burden of proving any real impairment of their rights and resulting prejudice. In the case at hand, the regulation permitted Ragsdale to bring suit under §2617, despite her inability to show that Wolverine's actions restrained her exercise of FMLA rights. [The regulation] transformed the company's failure to give notice -- along with its refusal to grant her more than 30 weeks of leave -- into any actionable violation of §2615. This regulatory sleight of hand also entitled Ragsdale to reinstatement and backpay, even though reinstatement could not be said to be "appropriate" in these circumstances and Ragsdale lost no compensation by reason of Wolverine's failure to designate her absence as FMLA leave.

<u>Id.</u> Based upon this well-established precedent, Plaintiff's FMLA interference claim fails as a matter of law.

      2.      **Plaintiff cannot establish that Aetna interfered with her rights under the FMLA and, therefore, summary judgment <u>in Aetna's favor is warranted on the interference claim.</u>**

Plaintiff admits that her interference claim is based solely upon the following allegations: (i) that she experienced stress because she had to ask her medical providers on two occasions to re-fax information to THD in support of her claim for STD benefits; (ii) that

Maroun told her in late August 2001 (after Plaintiff had received the August 20, 2001 Benefits

Certification denying benefits past August 7, 2001) that her leave was not approved; and

(iii) that "Grace" told her in late August 2001 (while Plaintiff was seeking an extension of her

STD benefits) that her claim was for STD, not FMLA. Such allegations clearly do not establish

an FMLA interference claim as a matter of law.

       As an initial matter, the undisputed facts demonstrate that Plaintiff's rights under

the FMLA and Aetna's FMLA policy were explained to her numerous times prior to August

2001. Plaintiff admits that she received numerous handbooks, benefits booklets and SPD's

throughout her employment, which explained in detail Aetna's FMLA policy, as well as the

interplay between STD and FMLA. Plaintiff admits that despite having these benefits

explanations in her possession, she never read them, despite that she executed the Statement

of Responsibility, acknowledging that she would do so. Moreover, the Certification Decisions

which she received from Aetna during her August 2001 leave provided information concerning

the FMLA. Plaintiff never called the Allentown facility's human resources representative

regarding her FMLA concerns. In any event, it is undisputed that pursuant to Aetna's policies

and procedures, Plaintiff's leave was automatically designated as FMLA protected when she

was approved for STD benefits, which was also explained to Plaintiff in the handbooks, benefit

booklets and SPD's.

       Thus, as a threshold mater, Plaintiff received all of the notice under the FMLA to

which she was entitled. Indeed, federal courts routinely hold that an employer is not required to

put an employee on notice that her FMLA clock is ticking when the employee is otherwise

already on a paid leave, and the failure to provide such a notice does not establish an FMLA

interference clam. See Shafnisky v. Bell Atlantic, Inc., 2002 WL 31513551, at *9 (E.D. Pa. Nov.

5, 2002) (employer was not required to inform plaintiff that 12 of the 52 weeks of STD leave

provided were designated as FMLA leave); Johnson v. Morehouse College, Inc., 199 F. Supp.

2d 1345, 1356-57 (N.D. Ga. 2002) (employee already on leave need not be given express notice that FMLA clock is also ticking).

Significantly, however, Plaintiff admits that she never lost or forfeited the protections of the FMLA, and thus, her interference claim fails for this additional reason. Plaintiff readily admits that she has received all money and benefits due to her from Aetna through the date of her resignation. She suffered no economic harm as a result of Aetna's actions. She never had a medical benefit claim denied during August 2001. Her job remained open until she resigned. Although Plaintiff experienced a brief delay in obtaining her STD benefits due to THD's difficulty obtaining medical records supporting her alleged disability, she admits that by mid-September, her STD benefits were approved through August 31, 2001, and she was eventually paid in full through that date. Thus, Plaintiff's own admissions demonstrate that she never suffered any harm or was in anyway prejudiced such as to support an FMLA interference claim as a matter of law. Thus, as in <u>Alifano</u>, <u>Lapham</u>, <u>Graham</u>, <u>Sarno</u>, <u>Summers</u>, <u>Bond</u>, <u>Dawson</u> and <u>Santos</u>, cited above, summary judgment in Aetna's favor is warranted as a matter of law.[14]

Furthermore, even if Plaintiff could establish some type of technical violation with respect to her FMLA notice and/or confusing information allegedly given by Maroun or "Grace," such a technical violation, without any associated harm or prejudice, cannot as a matter of law establish an FMLA interference claim. See <u>Ragsdale</u>, <u>supra</u>; <u>Graham</u>, <u>supra</u>. Moreover, Plaintiff's claim that she experienced stress because her medical providers had to re-fax their records to THD on two occasions in order to support her STD benefits claim, clearly does not

---

[14]To the extent Plaintiff claims that Aetna's alleged interference with her FMLA rights caused her to seek another job, with a lower pay rate, that claim is more properly a retaliation claim, which is discussed in the following section of this brief. In any event, damages such as future lost wages are not recoverable on an FMLA interference claim. See <u>Lapham</u>, <u>supra</u>.

establish an interference claim, particularly where emotional distress damages are not

recoverable in FMLA interference actions.  See Burch, supra; Graham, supra; Lloyd, supra.

Accordingly, based upon Plaintiff's own admissions, Plaintiff's FMLA interference

claim fails as a matter of law, and judgment in Aetna's favor on this claim is warranted.[15]

C.    The Undisputed Evidence Demonstrates That Summary
Judgment Is Warranted On Plaintiff's FMLA Retaliation Claim.

1.    Plaintiff is required to establish a prima facie case of
retaliation.

The requirements for establishing a prima facie case of retaliation under the

FMLA are well-established.  A plaintiff must show: (1) that she engaged in protected activity; (2)

that the employer took adverse action against her; and (3) that a causal link exists between the

protected activity and the employer's adverse action.  See Shanifsky, 2002 WL 31513551, at

*9; McCarron v. British Telecom, 2002 WL 1832848, at *7 (E.D. Pa. Aug. 7, 2002); Burch, 2002

WL 1471703, at *10.  If the plaintiff succeeds in presenting a prima facie case of retaliation, the

burden shifts to the defendant-employer to merely articulate a legitimate, non-retaliatory reason

for its action.  See Matthews v. Independence Blue Cross, 2002 WL 7930, at *3 (E.D. Pa. Dec.

28, 2001); Baltuskonis v. U.S. Airways, Inc., 60 F. Supp. 2d 445, 448 (E.D. Pa. 1999).  Once

the defendant satisfies this light burden, the ultimate burdens shifts to the plaintiff, who must

show by a preponderance of the evidence that the defendant's explanation is pretext for its

illegal action.  See Cohen v. Pitcairn Trust Co., 2001 WL 873050, at *10 (E.D. Pa. June 20,

2001); Baltuskonis, 60 F. Supp. 2d at 448.  In the present case, summary judgment is

warranted on Plaintiff's FMLA retaliation claim, since based upon her own admissions, Plaintiff

---

[15]To the extent that Plaintiff relies upon Aetna's failure to respond to the FMLA request
for benefits which she sent to the Company after her resignation, such actions obviously do not
support an FMLA interference claim.  It is well-established that the FMLA only provides its
protections to employees, and that there are no FMLA entitlements available post-employment.
See Lapham, 102 F. Supp. 2d at 270.

26

cannot establish a prima facie case of retaliation or that Aetna's articulated legitimate reasons for its actions (if any) are pretext for retaliation.  Indeed, Plaintiff admitted in her deposition that she has no facts to support her retaliation claim.

> 2.    No reasonable factfinder could find that Plaintiff engaged
>        in protected activity.

Although unclear, it is assumed that Plaintiff alleges that she engaged in protected activity by going on a leave of absence in August 2001.  Plaintiff admits that she never requested FMLA leave during her employment with Aetna.  At most, she alleges that on August 30, 2001 (the same day she called Maroun to tell her that she was resigning), Plaintiff asked a human resources representative named "Grace" on an Aetna hotline about receiving FMLA forms, while her claim for an extension of STD benefits was pending.  Plaintiff claims that "Grace" told her that her claim presently was one for disability, rather than FMLA, but still printed and sent the FMLA forms to Plaintiff.

No rational factfinder could find that during this conversation with "Grace," Plaintiff engaged in protected activity, even assuming the facts alleged are true. See Clark County School District v. Breeden, 532 U.S. 268 (2001).  The United States Supreme Court recently emphasized the type of activity necessary to rise to the level of protected activity under Title VII.[16]  In Breeden, the female plaintiff argued that she was retaliated against for complaining to her supervisors about a male supervisor who said in her presence: "I hear making love to you is like making love to the Grand Canyon."  The Supreme Court held that the plaintiff had not engaged in protected activity by complaining about the incident.  Specifically, the Supreme Court reasoned that no one could reasonably believe that the incident violated Title VII. Id. At 1509.

---

[16]Retaliation claims under the FMLA are analyzed using the same standards as retaliation cases under Title VII. See Shafnisky, 2002 WL 31513551, at *8.

27

Plaintiff's alleged protected activity (if any) here falls far short of the <u>Breeden</u> standard. At best, Plaintiff claims that she inquired about FMLA leave during her telephone call with "Grace," and was given confusing information concerning her need to apply for FMLA leave while seeking to extend her STD benefits. Plaintiff never testified that "Grace" told her she was not permitted to apply for FMLA benefits. Indeed, "Grace" sent Plaintiff the form to do so. Moreover, had Plaintiff ever consulted the numerous explanations of her leave benefits provided to her by Aetna, she would have understood the interplay of FMLA and STD benefits to which "Grace" referred. Thus, no reasonable factfinder could believe that Plaintiff engaged in protected activity during her call with "Grace," and her retaliation claim fails for this threshold reason.

3.    The undisputed evidence establishes that Plaintiff has not
suffered an adverse employment action sufficient to
<u>support a retaliation claim as a matter of law.</u>

Plaintiff's retaliation claim should also be dismissed for the threshold reason that she cannot establish that she suffered any kind of serious adverse employment action. An "adverse employment action" for a retaliation claim requires some serious and tangible harm. <u>See Sherrod v. Philadelphia Gas Works</u>, 209 F. Supp. 2d 443, 450 (E.D. Pa. 2002); <u>see also Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1300 (3d Cir. 1997). "An adverse employment action sufficient to support a <u>prima facie</u> case must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." <u>Sherrod</u>, 209 F. Supp. 2d at 450 (quoting <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998)). Not every job action that makes an employee unhappy or which the employee generally finds objectionable constitutes an adverse employment action supporting a retaliation claim. <u>See Sherrod</u>, 209 F. Supp. 2d at 450; <u>see also Robinson</u>, 120 F.32d at 1300. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder-employee did not like would form the basis of a [retaliation claim]." <u>Robinson</u>, 120

28

F.2d at 1300.  Plaintiff's alleged adverse employment actions (if any) are those type of trivial

annoyances that simply are not adverse employment actions sufficient to support an FMLA

retaliation claim as a matter of law.

        Significantly, job-related inconveniences are not adverse employment actions as

a matter of law.  For example, in considering the prima facie element of an "adverse

employment action" in the context of a retaliation suit, this Court has recently held that the

following "retaliatory actions" were insufficient to support a retaliation claim under Title VII:

being denied sick leave; being denied vacation time; being subjected to discourtesy and

rudeness by co-workers; threatening to change an employee's work record to prevent a

promotion; being physically pushed by a supervisor; being asked to "re-word" a completed job

report; revising a report to make the employee look complicit in a shooting; being re-interviewed

regarding a shooting incident; and allegations that rules and regulations were more diligently

imposed.  See King v. City of Philadelphia, 2002 WL 1277329, at *15 (E.D. Pa. June 4, 2002).

        The various "inconveniences" which Plaintiff alleges that she suffered during

August 2001 clearly are not as serious as those at issue in King, and thus, are not adverse

employment actions as a matter of law.  As adverse employment actions, Plaintiff merely

alleges that there was a delay in her receipt of STD, that she was confused concerning the

designation of her leave time as FMLA leave, that she had to ask her medical providers to fax

their medical records two times, that for one week, she had to call into work and leave

messages for Maroun, and Maroun was rude to her on one occasion.  Plaintiff readily admits

that she received all money and benefits to which she was entitled and that she was never

detrimentally effected by her leave of absence – she remained employed until her resignation

and her health benefits and other benefits were maintained during her absence.  Clearly,

Plaintiff's allegations (even if true) do not establish the required material changes in the terms

and conditions of her employment so as to constitute adverse employment actions as a matter

29

of law.  See Sherrod, 209 F. Supp.2d at 450; Dobbs-Weinstein v. Vanderbilt Univ., 185 F.3d

542, 545 (6th Cir. 1999) (no adverse employment action where plaintiff eventually received

benefit requested after proceeding through appeal procedures); Kelleher v. Solopak Pharm.,

Inc., 1997 WL 610779 (N.D. Ill. Sept. 26, 1997) (no adverse employment action where

termination letter sent by mistake while plaintiff applying for STD and plaintiff returned to work

without change in wages, title or benefits).

   Moreover, Plaintiff's claimed inability to get along with her co-workers prior to her

leave of absence (even if somehow related to her FMLA claim), does not constitute the serious

and tangible harm necessary to establish an adverse employment action.  In addition, Plaintiff's

lateral transfer to Maroun's unit is not an adverse employment action as a matter of law,

especially when the transfer was done pursuant to Plaintiff's request.    Federal courts routinely

hold that a lateral transfer to another department to relieve tension between that individual and

a supervisor is not an adverse employment action.  See Sherrod, 209 F. Supp.2d at 450

(dissatisfaction with job assignment not adverse employment action); Boykins v. Lucent Techs.,

Inc., 78 F. Supp.2d 402, 415 (E.D. Pa. 2000) (removal from regular job and placement in job

outside classification not adverse employment action), aff'd, 2002 WL 402718 (3d Cir. 2002).

   Lastly, Plaintiff did not suffer an adverse employment action with respect to the

cessation of her employment relationship with Aetna.  Simply put, the evidence establishes that

Plaintiff voluntarily resigned her position with the Company.  She called Aetna on August 30,

2001 and informed the Company that she would be resigning, and provided a handwritten note

setting forth the reasons for her resignation on August 31, 2001.  Although she stated in the

written resignation that she was "constructively discharged" pursuant to her attorney's direction,

Plaintiff admitted at her deposition that the reasons she resigned was due to her issues with

Taylor and Day, prior to her FMLA leave, and the slight delay in obtaining an extension of her

STD benefits.

It is well-established that an employee cannot establish that she suffered an adverse employment action to support a retaliation claim where the employee voluntarily quit her job. See Siko v. Kassab, Archibald & O'Brien, L.L.P., 2000 WL 3073247, at *6 (E.D. Pa. March 24, 2000). Moreover, Plaintiff cannot establish on the undisputed facts of this case that she was constructively discharged. Constructive discharge is established where an employer knowingly permitted conditions of discrimination in employment so unpleasant or difficult that a reasonable person would have felt compelled to resign. See Connors v. Chrysler Financial Corp., 160 F.3d 971 (3d Cir. 1998); Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir.), cert. denied, 510 U.S. 964 (1993). The Third Circuit "employ[s] an objective test in determining whether an employee was constructively discharged from employment: whether the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." Clowes, 991 F.2d at 1161. The employee's subjective perceptions are irrelevant to a claim for constructive discharge. Id. at 1162. Moreover, constructive discharge requires more than a hostile working environment, which Plaintiff clearly cannot even establish on these facts. See Benningfield v. City of Houston, 157 F.3d 369 (5th Cir. 1998), cert. denied, 526 U.S. 1065 (1999).

Here, at best, Plaintiff had difficulty dealing with a co-worker's use of perfume, the loudness of the unit in which she worked, and a supervisor who was rude on a single occasion. When Plaintiff complained about these issues concerns, Furry immediately addressed her concerns and honored her request for reassignment to a different unit. Of course, Plaintiff has no evidence (and has never even asserted) that these problems with Taylor or Day were discrimination of any kind, particularly where they predated her leave of absence and Plaintiff never returned to work and never had any further contact with Taylor or Day after her leave. Indeed, Plaintiff was immediately given a leave of absence when she

31

complained about her issues in Unit 73, and had only a slight delay in obtaining an extension of her STD benefits.  On these undisputed facts, Plaintiff clearly cannot produce any credible evidence from which a reasonably jury could conclude that she endured conditions of employment that were so unpleasant that a reasonable person would have felt compelled to resign.  See, e.g., Sherrod, 209 F. Supp. at 443 (holding no constructive discharge where plaintiff resigned when returned to job after FMLA leave for which she was dissatisfied).

In sum, it is undisputed that Plaintiff's economic conditions of employment were not modified (the fact that she had a brief delay in receiving STD benefits, which she eventually received in full, is not a change in the economic conditions) and that the alleged actions occurred for a brief period (primarily by a co-worker) and otherwise did not amount to a material change in Plaintiff's condition of employment.  Because Plaintiff cannot establish that she suffered any adverse employment action, she cannot establish a prima facie case of retaliation and this claim fails as a matter of law.

> 4.    Plaintiff cannot state a prima facie case of retaliation because she cannot establish the required causal connection between her alleged protected activity and the alleged adverse employment action by Defendant.

Assuming, arguendo, that Plaintiff suffered an adverse employment action, her retaliation claim nonetheless fails since the undisputed evidence demonstrates that she cannot demonstrate a causal link between the alleged protected activity (if any) and the alleged actions.  Courts in this circuit routinely grant summary judgment where a plaintiff cannot establish such a causal link.  See, e.g., Burch, 2002 WL 1471703, at *10; Cohen, 2001 WL 873050, at *9.  Significantly, the Third Circuit has recognized that the mere fact that an adverse employment action occurs after an alleged protected activity ordinarily is insufficient in itself to satisfy a plaintiff's prima facie burden of proving a causal connection.  See Robinson, 120 F.3d

32

at 1302; <u>Osuala v. Community College of Philadelphia</u>, 2000 WL 1146623 (E.D. Pa. Aug. 15, 2000).

In the present case, Plaintiff's own admissions demonstrate that she cannot establish the requisite causal connection. Plaintiff admits that she resigned her employment primarily because of her issues with Taylor and Day, not due to her FMLA claim. Moreover, it is undisputed that any delay in Plaintiff's receipt of her STD benefits (which she eventually received in full) was due to fact that THD did not receive her medical providers' information and the information received did not support her disability claim, not because of any alleged FMLA claim. Indeed, Plaintiff has no evidence that any individual processing her STD claim (who were individuals in Portland, Maine) had any knowledge whatsoever that she had asked for FMLA leave.

Significantly, Plaintiff did not even provide an FMLA request until <u>after</u> her resignation – it was back-dated August 31, 2001 (the date of her resignation) and received by Aetna on September 10, 2001. Clearly, this belated request was unrelated to her issues with Taylor and Day in late July and early August 2001, her requested transfer to Maroun's unit on August 2, 2001, and Maroun's request that she call into work and leave a message during the last few days of August 2001. It is obvious that absent knowledge of the alleged protected activity, such activity cannot possibly cause the adverse employment action. <u>See Burch</u>, 2002 WL 1471703, at *10 (no causal connection where decision to terminate made by employer prior to plaintiff's request for FMLA leave); <u>Vassallo v. Timoney</u>, 2001 WL 1243517 (E.D. Pa. Oct. 15, 2001) (dismissing First Amendment retaliation claim where defendants had no knowledge of protected activity); <u>King</u>, 2002 WL 1277329, at *12 (no knowledge of discrimination complaints prohibited liability for retaliation).

Plaintiff has completely failed to provide any evidence that her alleged protected activity caused an alleged adverse employment action (if any) and, thus, she has failed to

33

establish a prima facie case of retaliation as a matter of law.  Any speculation on her part of a

causal connection is insufficient to satisfy her burden.  See Cohen, 2001 WL 873050, at *9.

Accordingly, Aetna is entitled to summary judgment on Plaintiff's FMLA retaliation claim for this

additional reason.

> 5.    Even if Plaintiff could establish a prima facie case of
>        retaliation, Aetna has met its burden of providing legitimate
>        non-retaliatory reasons for its actions, and Plaintiff cannot
>        establish that these reasons are pretextual.

Even if Plaintiff could somehow succeed in establishing a prima facie case of

retaliation, the burden would then shift to Aetna merely to articulate legitimate, non-retaliatory

reasons for its actions.  See Burch, 2002 WL 1471703, at *9-10; Matthews, 2002 WL 7930, at

*3; Cohen, 2001 WL 873050, at *9.  Aetna has clearly met this burden.  Plaintiff admits that as

soon as she complained about Taylor's annoyances and her issues with Day's supervision of

the unit to Furry, Aetna took action and transferred her to Maroun's unit.  Since on August 20,

2001 Plaintiff's claims for STD benefits were initially denied past August 7, 2001, Maroun asked

Plaintiff to call in and leave a message as to whether she would be coming to work, but Plaintiff

remained employed with no action taken regarding her job and benefits while she sought an

extension of STD past August 7, 2001.  Plaintiff's STD determinations were delayed because of

issues with her medical certifications (that they had to be faxed two times and did not support a

finding of disability).[17]  When her medical providers' information was received, Plaintiff was

provided full STD benefits through her resignation.  Significantly, Plaintiff's employment and

other benefits were in no way effected during the period when the STD benefits decisions were

pending.

---

[17]Interesting, Plaintiff also no longer believed she was disabled late in August 2001,
since she was actively interviewing with other employers, claiming she was able to work.  She
commenced working for PMA on September 4, 2001, but did not inform THD about her
resignation or new job as she continued to press her STD claim throughout September 2001.

34

Moreover, Plaintiff received all money and benefits to which she would have been entitled under the FMLA. Indeed, pursuant to Aetna's FMLA policy (which Plaintiff admits she received, but never bothered to read), by applying for STD benefits and having her STD leave approved, Aetna automatically designated her leave as protected by FMLA. Moreover, while she sought recertification of her leave of absence past August 7, 2001, Aetna protected her job and benefits.

Thus, Aetna has carried its burden of articulating legitimate, non-retaliatory reasons for its actions (if any) concerning Plaintiff, and Plaintiff must prove by a preponderance of the evidence that the reasons offered by Aetna were not its true reasons, but were pretext for retaliation. See Matthews, 2002 WL 7930, at *3-5; Baltuskonis, 60 F. Supp.2d at 448-48 (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)); see also Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). Plaintiff must convince the trier of fact both that the reasons were false, and that retaliation was the real reason. See Matthews, 2002 WL 7930, at *3-5; Baltuskonis, 60 F. Supp.2d at 449-49; see also Jones v. School District of Philadelphia, 198 F.3d 412-13 (3d Cir. 1999). The ultimate burden of persuading the trier of fact that Aetna intentionally retaliated against Plaintiff remains at all times with Plaintiff.

Significantly, Plaintiff cannot meet this burden of establishing pretext by simply disagreeing with Aetna's actions and responses. See Cohen, 2001 WL 873050, at *10; see also Fuentes, 32 F.3d at 765; Ezold v. Wolf Block Schorr & Solis-Cohen, 983 F.2d 509, 533 (3d Cir. 1992). Plaintiff also cannot establish pretext by asking the Court to sit as a "super-personnel department," second-guessing her employer's employment decisions. See Cohen, 2001 WL 873050, at *10; see also Jones v. American Travelers Corp., 896 F. Supp. 463, 467 (E.D. Pa. 1995)(court's task "is not to second-guess employment decisions, but is instead to determine whether those decisions were animated by [unlawful] bias), aff'd, 85 F.3d 612 (3d Cir. 1996).

35

As set forth in detail above, the undisputed evidence establishes that all of Aetna's actions here with respect to Plaintiff were taken for legitimate, non-retaliatory actions and that its reasons were not pretext for retaliation.  Indeed, Plaintiff admits that she has no evidence of retaliation and is just proceeding on this claim because her attorney put it in the Complaint.  Such bare conjectures of discriminatory motives, however, do not establish pretext. See Matthews, 2002 WL 7930, at *3; Boykins, 78 F. Supp. 2d at 413 (noting that in Title VII action, "[p]retext cannot be established based upon speculation and mere conclusory allegations").

Accordingly, Plaintiff's FMLA retaliation claim should be dismissed for the alternative reason that Plaintiff cannot establish that Aetna's actions (if any) were pretext for retaliation.

IV.    CONCLUSION

It is abundantly clear from her own admissions that Plaintiff's lawsuit is both factually and legally unsupported.  Discovery has closed.  Plaintiff has raised no triable issue of any genuine issue of material fact.  Plaintiff should not be permitted to cause further expenditure of the public resources of this Court because of her inability to get along with her co-workers and the fact that she was unhappy because her disability benefits were not approved as quickly and easily as she had hoped that they would be.  For any and all of the

reasons set forth herein, Defendant Aetna Inc.'s Motion for Summary Judgment should be

granted and Plaintiff's Complaint should be dismissed in its entirety, with prejudice.

Respectfully submitted,


*/s/ Jill Garfinkle Weitz*
JILL GARFINKLE WEITZ
KLETT ROONEY LIEBER & SCHORLING
A Professional Corporation
Two Logan Square, 12th Floor
Philadelphia, PA 19103
(215) 567-7500

Attorneys for Defendant
Aetna Inc.


37

CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2003, I caused a true and correct copy of the

foregoing Motion for Summary Judgment to be served via first class mail, postage pre-paid,

upon the following:

Donald P. Russo, Esquire
117 East Broad Street
P.O. Box 1890
Bethlehem, PA 18016

/s/ Jill Garfinkle Weitz
JILL GARFINKLE WEITZ