IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

———

| | | |
|---|---|---|
| LISA BAILY, | : | CIVIL ACTION |
| Plaintiff, | : | NO. 02-5153 |
| | : | |
| VS. | : | |
| | : | |
| AETNA, INC., | : | |
| Defendant. | : | |

———

Tuesday, December 3, 2002

———

Oral Deposition of LISA M. BAILY, taken pursuant to notice, at the Law Offices of Klett Rooney Lieber & Schorling, 1200 Two Logan Square, 18th & Arch Streets, Philadelphia, Pennsylvania, beginning at 10:10 AM, before Dennis Corsi, Registered Professional Reporter and Notary Public.

———

DENNIS CORSI COURT REPORTING
Registered Professional Reporters
814 Park Avenue
Collingswood, New Jersey 08108
(856) 854-7223

CONDENSED TRANSCRIPT WITH KEY-WORD INDEX

Page 7

1    A. I started going back to school when I was
2 skill working at Aetna and currently where I'm working
3 now at PMA Insurance.
4    Q. Are they the only two jobs you've had since
5 high school?
6    A. No.
7    Q. What other jobs have you had?
8    A. I worked for temp services before, and it
9 was two of them. One is Roselli Temps, and I forgot
10 the name of the other one. It's been so long.
11    Q. Are they the only two jobs, other than Aetna
12 and PMA, that you worked at?
13    A. Yes.
14    Q. When were you hired by Aetna?
15    A. '96.
16    Q. Who hired you; do you recall?
17    A. I worked under a supervisor first there
18 under Karen Bellman.
19    Q. That was your first supervisor?
20    A. Yes.
21    Q. What was your position?
22    A. At the time, I was a clerical person.
23    Q. Clerical person?
24    A. Yes.

Page 8

1    Q. What were your job responsibilities?
2    A. For each area, it was different companies
3 between whatever the billings were, whether they be
4 hospital or doctor's bills or whatever.
5    Q. How long did you work in this clerical
6 position?
7    A. Six months.
8    Q. Until when approximately?
9    A. Probably around September or so of '96, and
10 I went into training for processing.
11    Q. After you went into the training, was Karen
12 Bellman still your supervisor?
13    A. No.
14    Q. Did you have any problems with Ms. Bellman?
15    A. No.
16    Q. How long were you in training?
17    A. At the time, I believe it was like six
18 weeks.
19    Q. Did you report to anyone at that time?
20    A. Just to whoever was in charge of the
21 training.
22    Q. Do you recall that person?
23    A. No, I don't.
24    Q. After you received the training, what was

Page 9

1 your next position with Aetna?
2    A. I was a data entry processor.
3    Q. I'd like to go back. What facility for
4 Aetna did you work at in 1996?
5    A. Allentown.
6    Q. Did you work at the Allentown facility
7 throughout your employment at Aetna?
8    A. Yes.
9    Q. When did you start as a data entry
10 processor?
11    A. If my remember me serves me correctly, there
12 was a period where they were merging with U.S. Health
13 Care, so I was doing their work for a while before I
14 got out of training, so it was after the holidays.
15    Q. After the holidays in 1996?
16    A. Yes, '96.
17    Q. The holidays meaning the Christmas holidays?
18    A. Yes.
19    Q. So the end of '96, very beginning of '97?
20    A. Yes.
21    Q. Who was your supervisor at that time when
22 you first became a data processor?
23    A. Joan McPeak. She has retired.
24    Q. Was there a name of the unit that you worked

Page 10

1 in with Ms. McPeak?
2    A. 73.
3    Q. What were your job responsibilities in unit
4 73?
5    A. At first, I was just processing claims, and
6 then I was eventually doing the backlog for each of
7 the companies that we had, and before I left, I was
8 also trained on the new system, so I was doing both
9 the new and old system.
10    Q. What do you mean by doing the backlog?
11    A. Each company has so much that comes in every
12 single day, and I had to keep track of how much
13 backlog there was.
14    Q. For each different company?
15    A. For each different company.
16    Q. You mean the different Aetna companies?
17    A. Yes.
18    Q. And then you kept track of that?
19    A. I kept track of that on a work sheet.
20    Q. When you say processing claims, what exactly
21 does that entail?
22    A. The system was electronic, and I basically
23 put it into the system and made sure they're paying
24 correctly.

Page 11

1    Q. You said that during this time that you
2 worked for Ms. McPeak, you were trained on the new
3 system as opposed to the old system.
4    A. Yes.
5    Q. What do you mean by that?
6    A. Before I left, they started converting over
7 to a newer system that's supposed to be faster, so I
8 had to learn that new system like everybody else.
9    Q. Was that the same job responsibilities that
10 you had?
11    A. Yes.
12    Q. Just a new computer system or a way of doing
13 it?
14    A. Yes, new computer system.
15    Q. Did you have any problems with Ms. McPeak
16 when she was your supervisor?
17    A. I can't recall any offhand right now.
18    Q. Did you continue to work in unit 73 through
19 August 1st of 2001?
20    A. Yes.
21    Q. At some point, was Ms. McPeak no longer your
22 supervisor?
23    A. Her last day, I don't remember if it was at
24 the end of the year of 2000 or the beginning of

Page 12

1 January.
2    Q. I don't mean to characterize your testimony,
3 so if I'm wrong, let me know. Either December of 2000
4 or January of 2001, Ms. McPeak no longer was your
5 supervisor?
6    A. Yes. She retired.
7    Q. Who became your supervisor at that point in
8 time?
9    A. Theresa Day.
10    Q. Did your job responsibilities change at all
11 when Ms. Day became your supervisor?
12    A. No.
13    Q. While you were employed by Aetna, did you
14 ever receive any type of information concerning
15 Aetna's benefits?
16    A. Regarding as far as what?
17    Q. General benefits given to Aetna employees.
18    A. Every year, they had a packet out.
19    Q. Did you receive that?
20    A. Yes.
21    Q. Were these packets entitled "a part of
22 life", if you recall?
23    A. I don't recall. They never went over it.
24 We received a lot of different things.

Page 13

1    Q. You received a lot of different things?
2    A. That they never went over. They just gave
3 them to us.
4    Q. But you got the benefit booklets each year?
5    A. Yes.
6        MS. WEITZ: We'll mark this as P-1.
7        (Whereupon exhibit P-1 was marked for
8 identification.)
9        MS. WEITZ: For the record, P-1 is a
10 booklet entitled "a part of life Aetna Benefits" dated
11 on the third page April of 1999.
12 BY MS. WEITZ:
13    Q. Is this one of the benefit booklets that you
14 would have received?
15    A. It looks like it, yes.
16        MS. WEITZ: P-2 is "a part of life
17 Aetna Benefits" booklet for June, 2000, and P-3 is "a
18 part of life Aetna Benefits" booklet for February,
19 2001.
20        (Whereupon exhibits P-2 and P-3 were
21 marked for identification.)
22 BY MS. WEITZ:
23    Q. Ms. Baily, I'm going to go back to P-2,
24 which is the booklet from 2000. Do you recognize that

Page 14

1 booklet?
2    A. Yes. I think I did receive this.
3    Q. And the same with P-3, the February of 2001
4 booklet, did you receive that as well?
5    A. I may have, yes. I'm not sure though if I
6 received this one.
7    Q. While you worked at Aetna, did you know of
8 an on-line or a computer system called AetNet or
9 Aetranet?
10    A. Yes.
11    Q. Is it AetNet?
12    A. I don't remember anymore.
13    Q. That was an intra-net or an internal network
14 for Aetna; is that correct?
15    A. Yes.
16    Q. What kind of information could be found on
17 AetNet?
18    A. I don't know. I never used it because my
19 job did not entitle me to use that, and with our work
20 schedule, we had no time really to look on it.
21    Q. Were you ever told that you could not go on
22 AetNet?
23    A. If we went on the Internet at all, it could
24 only be that Aetna site.

Page 15

1    Q. To your knowledge, were there handbooks or
2 summary plan descriptions for Aetna employees that
3 were contained on AetNet?
4    A. I don't know.
5    Q. Did you ever go onto it?
6    A. No, I did not.
7    Q. Did you ever receive a company handbook from
8 AetNet?
9    A. I did, but that was a while ago. I don't
10 remember receiving anything recently before I left.
11        MS. WEITZ: Plaintiff's exhibit-4 is a
12 document entitled "Acknowledgment of Receipt of Aetna
13 Handbook".
14        (Whereupon exhibit P-4 was marked for
15 identification.)
16 BY MS. WEITZ:
17    Q. Do you recognize plaintiff's exhibit-4?
18    A. Yes.
19    Q. Is that your signature on the document?
20    A. Yes.
21    Q. Is it true that you received an Aetna
22 Handbook on April 3rd of 1997?
23    A. Yes.
24    Q. The name on the acknowledgment says Lisa

LISA M. BAILY                    CondenseIt!™                    BAILY VS. AETNA, INC.

Page 17

1  Baily 051 through Baily 073. I believe it's dated
2  1-99 on the back cover.
3  BY MS. WEITZ:
4      Q. Ms. Baily, do you recognize this document?
5      A. This one I think I do only because I had
6  looked at this one, but that was a while ago.
7      Q. P-6, the Aetna Handbook from January of
8  1999, you received that during your employment with
9  Aetna; is that correct?
10     A. Yes.
11     Q. Did you know what Aetna's Access HR is?
12     A. No, I don't.
13     Q. How were you informed that Theresa Day had
14 become your supervisor?
15     A. There was a posting because, as I stated,
16 the current supervisor was retiring. They had posted
17 her job, and she was working in our unit, and she
18 posted for it, and she got hired, and we were told
19 after she got hired.
20     Q. Did you also apply for the job that Theresa
21 Day received?
22     A. No, I did not.
23     Q. Did you work alongside Theresa Day, meaning
24 in the same unit?

Page 18

1      A. Yes.
2      Q. For how long?
3      A. I believe she was already working in that
4  unit when I came aboard and worked in that unit. So
5  basically, it was for the whole time.
6      Q. Prior to the time that she became your
7  supervisor, did you have any problems working with or
8  in relationship with Theresa Day?
9      A. I never really had any problems with her. I
10 worked with her, but obviously, we weren't best
11 friends or anything, but I just worked with her. I
12 knew who she was and stuff, but I didn't have any
13 problems with her.
14     Q. Did you ever file any complaints about her?
15     A. No.
16     Q. While she was your supervisor, did Ms. Day
17 ever have the opportunity to review your performance?
18     A. Yes.
19     Q. The performance reviews that you received
20 from her were --
21     A. Monthly.
22     Q. What kind of monthly performance reviews did
23 you receive from her?
24     A. We had audits every single month that they

Page 20

1      A. There were a couple. The last one was
2  Warren Furry.
3      Q. How long was Warren Furry Ms. Days'
4  supervisor?
5      A. I don't remember.
6      Q. Do you know what his position was called?
7      A. Not off the top of my head I don't.
8      Q. Aetna in the Allentown facility, did they
9  have a human resources department?
10     A. Yes.
11     Q. Do you know how many people worked in the
12 human resources department?
13     A. No, I don't.
14     Q. Was there a particular human resources
15 person that was assigned to your unit, to your
16 knowledge?
17     A. No, there wasn't.
18     Q. How many processors were there who worked
19 for or were in unit 73 under Ms. Day?
20     A. Probably about 20.
21     Q. When I say unit 73, was Ms. Day the sole
22 supervisor in unit 73?
23     A. For 73 processing, yes.
24     Q. Is there another unit 73?

**DENNIS CORSI COURT REPORTING**                    Page 17 - Page 20

Page 21

1    A. There's unit 73 for the call center which
2 answers the phone, and that would have another
3 supervisor.
4    Q. Who was that?
5    A. I don't remember what her name was off the
6 top of my head.
7    Q. You also received quarterly evaluations from
8 Ms. Day; is that correct?
9    A. I believe so, yes.
10       (Whereupon exhibit P-8 was marked for
11 identification.)
12 BY MS. WEITZ:
13    Q. Do you recognize P-8?
14    A. Yes.
15    Q. That's your quarterly evaluation dated May
16 31, 2001; is that correct?
17    A. Yes.
18    Q. And that's your signature on the second
19 page?
20    A. Yes.
21    Q. Ms. Day was your immediate manager; is that
22 correct?
23    A. Yes.
24    Q. From the time she became your supervisor

Page 22

1 until the date of this quarterly evaluation at the end
2 of May of 2001, did you have any problems or issues
3 with Ms. Day?
4    A. I can't really say that I had direct
5 problems with her as far as not directly, but I know
6 there was things that I heard and I saw that she was
7 doing that I didn't like.
8    Q. What kind of things did you see that she was
9 doing that you didn't like?
10    A. I was told this was supposed to be
11 confidential.
12    Q. I'm sorry.
13    A. I was told everything for our performances
14 are supposed to be confidential, and I saw that she
15 was showing other people our results, which she was
16 not allowed to do.
17    Q. When did you see her doing that?
18    A. She was able to pull out our results every
19 single day when they were coming out, and she would do
20 it with other people, and she would show other people
21 that were standing at her desk what other people had.
22    Q. How did you know that she was doing that?
23    A. Because I was at the desk several times when
24 she did it.

Page 24

1    A. I'd say, at least, five times.
2    Q. Did you discuss this with Ms. Day at all?
3    A. I didn't because it didn't concern me
4 because it wasn't my results that she was showing.  It
5 was somebody else's, so I felt that it wasn't my
6 place.
7    Q. The fact that Ms. Day was showing the
8 results to Ms. Watkins, did you ever discuss that with
9 any of your coworkers?
10    A. There was one girl that was working in the
11 unit also, and she's the one that works there.  She
12 had a problem with it because she was showing Heather
13 hers, so she had a problem with that, and I know she
14 did say something to Terry about it because she told
15 me that she did.
16    Q. Who was this other person whose results were
17 being shown?
18    A. I don't remember what her name was offhand.
19    Q. Was it Heather Roche?
20    A. I believe so.
21    Q. Did you bring it up with Ms. Roche, or did
22 she bring up the issue with you concerning Ms. Day
23 showing her results?
24    A. She brought it up.

Page 25

1   Q. This was going on prior to May 31st of 2001;
2 is that correct?
3   A. Yes.
4   Q. I'm still in that time span. Did you ever
5 complain to anybody within Aetna that Ms. Day was
6 showing the audit reports to Ms. Watkins?
7   A. I know I told Warren Furry about it when I
8 had a meeting with him about that, and that wasn't
9 until July because we were told that -- She had told
10 us that she was going to stop that and wasn't going to
11 do that anymore, but then Heather, I guess, found out,
12 and she talked to me about this --
13   Q. Are we past --
14   A. Yes.
15   Q. I'll get to that later. I'm talking about
16 the January to the May 31 time period.
17   A. No.
18   Q. You did not complain to anyone within Aetna
19 about it going on?
20   A. No.
21   Q. You just said that someone talked to Terry
22 about it, and she said she had stopped it; correct?
23   A. Yes.
24   Q. Terry being Theresa Day?

Page 26

1   A. Yes.
2   Q. Who spoke to Terry about it?
3   A. Heather Roche.
4   Q. Were you present during this conversation?
5   A. No. Heather told me about it.
6   Q. When did Heather Roche tell you that she
7 spoke to Terry that day?
8   A. I don't remember exactly. I believe it was
9 July.
10   Q. Of 2001?
11   A. Yes.
12   Q. What did Heather Roche tell you in that
13 conversation?
14   A. She told me that Theresa Day did not realize
15 that she could not pull up other people's results, but
16 she knew now, so she was only going to pull up one
17 person's results at a time so that not everybody could
18 still everybody else's results because there was
19 different screens. Warren told her just to show the
20 individual, so Theresa was only showing the
21 individual's results by pulling it up by person and
22 not by the unit.
23   Q. Am I correct that when initially Ms. Day was
24 showing the results of other people to an employee,

Page 27

1 she didn't realize it was in response to that employee
2 asking to see her own results?
3   A. Yes.
4     MS. NENNI: Objection to the form of
5 the question.
6     Wait until she finishes her question
7 before you give an answer.
8 BY MS. WEITZ:
9   Q. I may have asked you this before. I
10 apologize if I'm repeating. You never discussed with
11 Ms. Day the fact that she was showing Ms. Watkins
12 other people's audits; is that correct?
13   A. No, I didn't.
14   Q. When I asked you previously about your
15 problems with Ms. Day, and I'm talking again through
16 January of 2001 through May 31 of 2001, you said she
17 was doing things you didn't like.
18   A. Yes.
19   Q. Other than showing the audit, was she doing
20 anything else that you didn't like?
21   A. She was showing a lot of favoritism to her
22 friends in the unit, people that she was friends with
23 before she became supervisor.
24   Q. Who were the friends?

Page 28

1   A. There was Heather Watkins. I just don't
2 remember anybody else.
3   Q. You don't recall anyone else?
4   A. Not right off the top of my head I cannot.
5   Q. If you recall the name of someone else, I
6 ask that you let me know.
7   A. Okay.
8   Q. What do you mean by favoritism? What was
9 she doing? What was Ms. Day doing?
10   A. Like if Heather was late coming back from
11 lunch, she would let it go.
12   Q. Anything else?
13   A. I know there was times when they would go
14 out to lunch, which they told us employees we're not
15 supposed to be eating lunch with any friends.
16   Q. Who told you that?
17   A. People from HR told us that.
18   Q. Do you recall who from HR?
19   A. No, I don't.
20   Q. How do you know she ate lunch with Heather?
21   A. We would see them come back from lunch
22 together.
23   Q. Did anyone actually see them at a table
24 together?

Page 31

1    Q. To your knowledge, did Ms. Day ever give out
2  personal or confidential information about you?
3    A. The one time when I was out sick, I heard
4  that she told Heather Watkins why I was out sick.
5    Q. How did you hear this?
6    A. Through several people that I had worked
7  with. One was Heather Roche. Another one was Edith
8  Taylor. She told me that she asked her why I called
9  out, which wasn't anybody's business.
10    Q. Any other personal confidential information
11  that they gave out about you?
12    A. To my knowledge, nothing that I know of.
13    Q. When was it that you called out sick that
14  you were referring to?
15    A. I think the last time I stayed home. I
16  don't remember.
17    Q. Of 2001?
18    A. Yes.
19    Q. What was it about confidential information
20  or personal information that Ms. Day disseminated
21  about you, to your knowledge?
22    A. She said I was out for medical reasons, and
23  for me, no one has the business to know why you're
24  out. If you're out, there's no reason for anybody

Page 32

1  else to know why you're out sick.
2    Q. To your knowledge, did Ms. Day tell others
3  about what the medical reason was for your absence?
4    A. Not to my knowledge, no.
5    Q. Just that you were not at work today for a
6  medical reason; is that correct?
7    A. Yes.
8    Q. Any other ways that Ms. Day showed
9  favoritism while you were working with her? I'm again
10  saying from January of 2001 through May 31st of 2001.
11    A. Just little things, like she would allow
12  them to talk for long periods of time instead of doing
13  their work.
14    Q. Allow who to talk?
15    A. Heather Watkins and other people in the unit
16  would just talk instead of doing what they were
17  supposed to be doing and working. They would not be
18  working. They would be gossiping instead of doing
19  their jobs.
20    Q. Were there times that you were talking
21  instead of doing your job?
22    A. No.
23    Q. Did you ever have to take on more work
24  because Heather Watkins or the other favorites were

Page 33

1 talking instead of doing their job?
2    A. Well, we're a team, so you're supposed to
3 work together.
4    Q. Any other way that Ms. Day showed
5 favoritism?
6    A. I can't recall of any others.
7    Q. I'm going back to the original question.
8 Are there any other problems that you had with Ms. Day
9 from January 1st, 2001 through May 31st, 2001?
10    A. I can't recall any others.
11    Q. I'm going to go from June 1st, 2001 through
12 the last day that you worked for Ms. Day. When was
13 the last day that you worked for Ms. Day?
14    A. I would say on my leave. They switched
15 supervisors, I believe, in August.
16    Q. Do you know what day?
17    A. I believe around the 7th or 8th.
18    Q. 7th or 8th of August?
19    A. Yes, around there.
20    Q. That you switched supervisors?
21    A. I don't remember the exact day. It was when
22 I was out.
23    Q. When was the last day that you physically
24 came into work at Aetna?

Page 34

1    A. August 2nd, 2001.
2    Q. Between August 2nd, 2001, and I'm going to
3 say August 8th of 2001, did you have any further
4 contact with Theresa Day?
5    A. No.
6    Q. Between June 1st, 2001 and August 2nd, 2001,
7 did you have any problems with Theresa Day?
8    A. Toward the end, yes.
9    Q. Can you give me dates for a time frame?
10    A. I'd say probably around July, somewhere in
11 July --
12    Q. Mid July, beginning, end, to the best of
13 your knowledge if you can approximate?
14    A. I would say middle.
15    Q. What were the problems that you had with Ms.
16 Day starting the middle of July, 2001?
17    A. Getting along with other people in the
18 unit. They made complaints about Edith Taylor. She
19 would spray her perfume while sitting at her desk, and
20 we made several complaints to Theresa regarding that.
21 We were basically told from Theresa Day that we had to
22 deal with it because she worked in our unit before she
23 became supervisor, so we had to deal with it.
24    Q. Was Edith Taylor one of Ms. Day's

Page 35

1 favorites?
2    A. I can't say that for sure.
3    Q. Where did you work in relation to where Ms.
4 Taylor worked?
5    A. Right next to her.
6    Q. You've said that you complained to Ms. Day
7 about it; is that correct?
8    A. Yes.
9    Q. How many times did you complain?
10    A. At least two or three. I know I complained
11 myself.
12    Q. Were you alone when you did it, or were
13 other people with you?
14    A. Other people.
15    Q. Who else was there?
16    A. Heather Roche. I believe there was Cindy
17 Hoffman. I'm trying to remember another, but I don't
18 remember off the top of my head how many were there at
19 the time. Jennifer Bachman.
20    Q. Do you know whether or not Ms. Day ever
21 spoke to Edith Taylor about her perfume?
22    A. I don't know.
23    Q. Did it ever get any better?
24    A. No.

Page 36

1    Q. Did you ever speak to Edith Taylor about the
2 perfume?
3    A. I didn't because if you say anything, she
4 did it even more on purpose.
5    Q. Would she threaten you? What do you mean by
6 she would do it more on purpose?
7    A. She knew that people had complained about
8 the perfume, so she would purposely do it right before
9 she would leave the building like when she was going
10 to lunch or when she was leaving for the day.
11    Q. Other than the complaints about Edith
12 Taylor's perfume, any other problems that you had with
13 Ms. Day from June 1st of 2001 through August 2nd,
14 2001?
15    A. Well, that's what led to the other problems
16 that I was having with her spraying the perfume, with
17 Edith Taylor spraying the perfume. That's what led to
18 the other problems that I was having with her.
19    Q. What were the other problems that you were
20 having with Ms. Day?
21    A. There was a point where I sent Warren Furry
22 an E-mail addressing that issue because I felt that
23 Terry Day did not handle it, and from that E-mail is
24 when I started getting harassed by Theresa Day because

LISA M. BAILY                                CondenseIt!™                    BAILY VS. AETNA, INC.

Page 37

1  I sent that E-mail to Warren.
2      Q. Before the E-mail, did you ever speak to
3  Warren Furry about the perfume situation?
4      A. No, I did not.
5          MS. WEITZ:  Can we take a two-minute
6  break?
7          MS. NENNI:  Sure.
8          (Break taken in the proceedings from
9  11:01 AM to 11:14 AM.)
10         (Whereupon exhibit P-9 was marked for
11 identification.)
12 BY MS. WEITZ:
13     Q. Ms. Baily, do you recognize P-9?
14     A. Yes.
15     Q. P-9 at the bottom under original message, is
16 that the E-mail which you had sent to Warren Furry?
17     A. Yes.
18     Q. Then the top part says from Warren Furry to
19 Lisa Baily.  Is that a copy of Mr. Furry's response?
20     A. Yes, it is.
21     Q. When did you receive this response?
22     A. The response is dated July 30th.
23     Q. You received it on the day he sent it?
24     A. Yes.  Actually, it may have been the next

Page 38

1  day because I may have been gone already, so it may
2  have been the 31st of July.  I left for the day.
3      Q. You were still working at Aetna?
4      A. Yes.
5      Q. What time did you normally leave?
6      A. 2:15.  I don't remember if I left on time
7  that day or not.
8      Q. You said that after you sent this E-mail,
9  you started getting harassed by Theresa Day; is that
10 correct?
11     A. Yes.
12     Q. What do you mean by harassed?
13     A. After I spoke with Warren and I got this
14 E-mail, I had spoken with him --
15     Q. Can I backtrack then?
16     A. Yes.
17     Q. When you spoke with Warren concerning this
18 E-mail, when did you speak to Warren?
19     A. I'm trying to think of the date.  I believe
20 it was on the 31st.
21     Q. Of July?
22     A. Of July.
23     Q. Was anyone else present, other than you and
24 Warren, during this meeting?

Page 40

1  had spoken to Theresa Day regarding this.  Then he
2  called me in to let me know that he had spoken with
3  her, and in the meantime, there was a time period
4  after he had spoken with her and calling me in,
5  because she purposely said this loud enough so that
6  everybody in the unit could hear her regarding this
7  E-mail, you know, that I sent this E-mail to him
8  regarding the perfume issue, and with how loud the
9  unit is, at the time, I believe she spoke to Heather
10 Watkins, and Edith Taylor was at her desk, but she had
11 said it loud enough regarding these issues so that
12 everybody could hear her.
13     Q. Let me backtrack because I want to get the
14 time line correct.  You sent the E-mail to Warren.
15     A. Yes.
16     Q. On Thursday, July 26th; correct?
17     A. Yes.
18     Q. What happened next after this E-mail?
19     A. At the time while I was on vacation until
20 Monday, that's why he did not respond until Monday, so
21 I did not hear anything back from him until Monday,
22 and then he spoke with Theresa Day, and I don't know
23 if it was Monday or Wednesday morning -- Tuesday
24 morning.  Excuse me.

DENNIS CORSI COURT REPORTING                                    Page 37 - Page 40

Page 41

1  Q. Monday meaning the 30th of July or Tuesday
2  the 31st?
3  A. Yes.
4  Q. Go ahead.
5  A. I'm not sure exactly when he spoke with her
6  regarding this. Then he had called me to let me know
7  that he had spoken with her, and I had told him --
8  Q. Were there issues in your unit before you
9  went to speak with Warren Furry, or did you have
10 problems with Ms. Day before you went into Mr. Furry's
11 office?
12 A. There was problems in the unit itself
13 beforehand, you know, as far as the unit was very loud
14 and very talkative, and other supervisors have
15 complained about how loud our unit was in regards to
16 talking and stuff.
17 Q. That was in your original E-mail on July
18 26th.
19 A. Yes.
20 Q. Prior to July 26th, did you ever complain to
21 anyone about how loud or talkative the unit was?
22 A. I didn't, only because sometimes Theresa Day
23 would join in with the conversation being loud, so to
24 me, I felt like there wasn't anyplace to go because if

Page 42

1  she was joining in being loud, there's really no
2  supervisor to go to.
3  Q. What were the problems that you had with the
4  fact that the unit was loud?
5  A. It would affect your work because they were
6  loud enough -- You were allowed to play your radio at
7  work, but you could still hear them being loud, so
8  that would distract you when you were trying to do
9  your work.
10 Q. When did the loudness or when did these
11 problems start?
12 A. They were always there, but toward the end
13 of July is when it really started getting really bad
14 with how talkative and how loud they were.
15 Q. Who was doing the talking or who was loud?
16 A. Various different people in the unit;
17 Heather Watkins, Heather Roche, Edith Taylor. There
18 was some other people in the unit, but I don't
19 remember what their names are.
20 Q. What were they doing that made them loud?
21 Was it just their talking?
22 A. Just their talking.
23 Q. Where would they stand in proximity to you
24 during this time?

Page 43

1  A. The desks were very close together, so I
2  would say maybe about 10 feet from me, and depending
3  on who they were talking to, several times, Edith
4  Taylor would come exactly to my desk and talk over the
5  wall because there was like a partition that divided
6  everybody's desks, and she would stand there and talk
7  next to me on the other side of the wall.
8  Q. Who was the person that sat on the other
9  side?
10 A. At one point, it was an open desk, so the
11 people that worked at home would come in and sit
12 there, so it varied as to who sat there.
13 Q. What kind of things would they talk about?
14 A. Personal stuff like how their kids were, you
15 know, stuff that had nothing to do with work.
16 Sometimes it would be about work, but sometimes it
17 would be, you know, about either what they were doing
18 that night or personal stuff.
19 Q. Did you ever ask any of your coworkers to
20 quiet down a little?
21 A. I know I asked Edith Taylor if she could go
22 talk someplace else one time, and she got smart with
23 me about it.
24 Q. What did she say?

Page 47

1    Q. I'd like to go back to my question a long
2  time ago.  Describe in detail your conversation with
3  Warren that day.
4    A. I had discussed the issues that I sent in
5  the E-mail, and I had also discussed him saying --
6  Well, Theresa saying, you know, the comments that she
7  had made loud enough for everybody to hear about the
8  E-mail and Heather Watkins and Edith Taylor being at
9  their desks and everything that she discusses in the
10  office is supposed to be confidential, meaning that
11  it's not supposed to go outside anywhere, and I had
12  discussed the fact that Theresa Day did it because of
13  the E-mail and stuff; that she obviously was saying
14  things to everybody that was said in confidentiality
15  between her and Warren when they had their meeting,
16  only because she was loud enough for everybody to hear
17  in the unit, so I had discussed that with him, and he
18  had said that he was going to talk to her about it,
19  and I also told him that I felt like I could not trust
20  Theresa Day because of, you know, of her breaking
21  confidentiality and stuff like that, and I had asked
22  if I could be moved or go into another unit because of
23  the fact that I felt like I couldn't trust her as a
24  supervisor.

Page 46

1  give her the backlog every day, and she would just --
2  I'm trying to think of how to put it.  She would, more
3  or less, be nasty with me when I would give her the
4  backlog.
5    Q. Anything else that changed?
6    A. I don't recall, right at this moment,
7  anything else.
8    Q. What do you mean by Theresa was nasty to
9  you?
10    A. When I would give her the sheet, she would
11  like, you know, grab it away or give me a nasty look
12  when I gave it to her.
13    Q. Anything else?
14    A. I don't recall if she ever said anything to
15  me when I handed it to her.
16    Q. Anything else that she did that was nasty?
17    A. I know after I talked to Warren --
18    Q. I just want to talk about this period of
19  time.
20    A. Yes, not before.
21    Q. Then you testified, at some point, probably
22  on July 31st; am I correct, that you spoke with
23  Warren?
24    A. Yes.

Page 49

1 know whether or not Terry said anything to other
2 employees in the unit about your complaints concerning
3 the loudness?
4    A. Not directly, no.
5    Q. What did Warren say when you asked to be
6 moved to another unit?
7    A. He said he would look into it.
8    Q. Anything else that you recall that was
9 discussed during your meeting with Warren on July
10 31st, 2001?
11    A. Not at that first meeting, no.
12    Q. What time of day was the meeting with
13 Warren, if you remember?
14    A. I don't recall.
15    Q. Did you return to your desk that day after
16 speaking with Warren?
17    A. Yes, I did.
18    Q. You testified that in your work, the
19 harassment by Theresa got worse.
20    A. Yes.
21    Q. When was that?
22    A. After I had spoken with Warren, he said --
23 When I spoke with Warren, he said he was going to
24 speak with Theresa Day again, and I'm assuming he did,

Page 50

1 only because after she came out, Heather Watkins and
2 Edith Taylor were at their desks.
3    Q. You assumed she did. Do you know for a
4 fact?
5    A. No, I don't. I only know, and I'm assuming
6 only because of what was said afterwards.
7    Q. Did Theresa leave her desk at some point, to
8 you knowledge?
9    A. Yes.
10    Q. And then she returned?
11    A. Yes.
12    Q. Do you know how long she was gone?
13    A. No, I don't.
14    Q. Then what happened?
15    A. After she returned to her work, Heather
16 Watkins and Edith Taylor went up to her desk, and
17 Theresa said very loudly, and I believe this was
18 toward the end of the day, about the fact how she
19 didn't care. She didn't care if she lost one of her
20 best processors because of this issue, you know, as
21 far as my leaving. I'm assuming what she meant by
22 that comment is because I asked to leave the unit. I
23 asked to be changed to another unit. She had made
24 that comment. She didn't care if she lost one of her

Page 51

1 best processors because of this issue. That was said
2 in confidentiality, and it should not have been said
3 to other people.
4    Q. What else happened?
5    A. At that time, Heather Roche was leaving for
6 the day, and Heather Roche went to say good night to
7 Terry, you know, because she was leaving for the day,
8 and as Heather Roche was leaving, Theresa Day said
9 very nasty to her -- Edith Taylor looked exactly at me
10 and said that she felt like smacking someone. I was
11 getting ready to leave for the day, so I had left, and
12 then the next day --
13    Q. I'm going to stop you there. I'm going to
14 stay on the same day, the 31st. After Theresa came
15 back to her desk, did you personally witness Terry
16 saying good-bye in a nasty way to Heather Roche?
17    A. Yes, I did.
18    Q. And then, did you personally hear Edith say
19 she felt like smacking someone?
20    A. Yes, I did.
21    Q. After that, what happened?
22    A. As I stated, I was getting ready to leave
23 for the day, and I was packing up. After I packed up
24 and turned off my computer, I went to sign out and

Page 52

1 leave for the day.
2    Q. Did anything happen with Theresa when you
3 went to sign out?
4    A. I didn't bother with her.
5    Q. Nothing else happened on the 31st in terms
6 of you and Theresa?
7    A. No.
8    Q. Or any of your coworkers?
9    A. No.
10    Q. What happened next?
11    A. I was upset about the whole issue, and the
12 next morning, I spoke to Warren Furry.
13    Q. I'd like to stop you there.
14    A. Okay.
15    Q. Did you speak to Heather Roche that day?
16    A. I had spoke to Heather Roche because she had
17 called me regarding what had happened while she was
18 leaving.
19    Q. When did she call you?
20    A. I don't remember what time it was. It might
21 have been that day.
22    Q. Can you describe that conversation?
23    A. She had asked me if I heard everything that
24 was said, and I said, yes. I had told her about the

Page 53

1 comment that Edith Taylor had made as she was leaving
2 because at that time, she was already at the door, and
3 I said, "I don't know if you heard her say that or
4 not." We had basically discussed that, you know, what
5 was said afterwards with Edith saying that. We had
6 talked about that because both of us did not know if
7 she was saying it to me or Heather Roche because
8 Heather Roche was leaving at that time, so we didn't
9 know which one that statement was directed at from
10 Edith Taylor.
11    Q. Was there anything else said to Heather
12 Roche by you at the end of the day on the 31st?
13    A. I don't recall.
14    Q. Did you discuss your meeting earlier that
15 day with Warren Furry?
16    A. I just told her I had a meeting with Warren.
17    Q. Did you tell her what happened during the
18 meeting?
19    A. No.
20    Q. Did Heather discuss with you any problems
21 she had in the unit?
22    A. She had the same problems basically as far
23 as the perfume, but I don't remember if we talked
24 about that that night or not.

Page 54

1    Q. Anything else you remember from that phone
2 call with Heather?
3    A. I don't recall.
4    Q. What happened next? You went to work?
5    A. I went to work the next day.
6    Q. That's August 1st?
7    A. Yes. I started work at 6:00. Warren Furry
8 did not come in until after 6:00. When he came in,
9 Heather went to him to let him know about what Edith
10 Taylor said.
11    Q. What time did you go to see Warren?
12    A. I believe it was before 7:00.
13    Q. Before 7:00?
14    A. Yes.
15    Q. Was Theresa in the unit? Was she at work
16 before you went to see Warren that morning?
17    A. No.
18    Q. Go on. You went to see Warren Furry.
19    A. I went to see Warren Furry, and I had told
20 him what Edith Taylor had said, and he told us that we
21 needed to go to human resources.
22    Q. Did you feel threatened by what Edith had
23 said?
24    A. Yes, I did.

Page 55

1    Q. Did you think she was going to smack you?
2    A. Truthfully, I don't know. I mean, I felt
3 like it, but I don't know if she would have or not.
4    Q. So Warren said for you to go to human
5 resources; is that correct?
6    A. Yes.
7    Q. Did anything else happen during that
8 conversation?
9    A. He only told us that we had to go to human
10 resources and discuss that issue.
11    Q. And both you and Heather Roche were together
12 at that time?
13    A. Yes.
14    Q. Did you go to human resources?
15    A. Yes. They didn't open until 8:00, so we had
16 signed out in order to go over to human resources.
17    Q. How long was your meeting with Warren that
18 morning on August 1st?
19    A. It was just a couple minutes. We had spoken
20 to him, told him what had happened the night before,
21 and he had told us that we had to go to human
22 resources.
23    Q. After you left his office before HR opens at
24 8:00, what did you do?

Page 56

1    A. Went back to work.
2    Q. Was Theresa there at work?
3    A. I don't recall what time she came in that
4 day.
5    Q. What time did you go to human resources?
6    A. About 8:00.
7    Q. Was Theresa in the unit? Was she at work
8 when you went over to HR?
9    A. Yes.
10    Q. Were there any issues, any problems with
11 Theresa before you went to HR that morning?
12    A. I didn't say anything to her, so, no.
13    Q. What happened when you went to HR?
14    A. Only the secretary was in at the time.
15    Q. Do you remember who that person was?
16    A. No, I don't. She told us that we could sit
17 and wait until the human resources person that we
18 needed to speak with came in.
19    Q. How long did you have to wait?
20    A. I believe it was until 9:00 or 10:00. I
21 don't remember.
22    Q. How many human resources people came in?
23    A. Just the one, and I forget the name
24 offhand.

Page 57

1  Q. Could it have been Sue Williams?
2  A. I believe it might have been.
3  Q. So it was Sue Williams who was the HR
4 person?
5  A. I believe it was.
6  Q. What happened when she came into the HR
7 office?
8  A. She spoke with Heather Roche first, and then
9 she came in after she spoke with Heather Roche, and
10 she came to talk to me, and I told her what was going
11 on.
12  Q. At the time that you said she spoke to
13 Heather Roche, where were you?
14  A. I was sitting like in the reception area.
15  Q. How long did she speak to Heather?
16  A. Maybe 15 minutes to a half-hour. I don't
17 recall.
18  Q. Then were you brought into a conference room
19 or into an office?
20  A. Into an office.
21  Q. I'd like you to describe in detail your
22 conversation with Ms. Williams at that time.
23  A. I had explained to her everything that had
24 happened as far as Theresa and Edith Taylor and how

Page 58

1 Edith Taylor stated that statement about wanting to
2 smack someone and how I felt threatened.
3  Q. When you said you explained all the problems
4 with Theresa, what do you mean? I want to know
5 exactly what you said to Ms. Williams.
6  A. I had discussed it with her as far as how I
7 felt I was being harassed with Theresa Day because of
8 everything, you know, all the comments and everything
9 that had happened in the unit with her stating things
10 that was said in confidentiality to her and how I felt
11 that I couldn't trust Theresa Day because of that and
12 regarding Edith Taylor about the statements she had
13 made.
14  Q. Anything else that you told Ms. Williams
15 during that meeting?
16  A. I just told her that I did not feel safe in
17 going back to work because I sit right next to Edith
18 Taylor, and I would have to deal with her.
19  Q. Anything else?
20  A. I don't recall offhand.
21  Q. How long did you meet with Ms. Williams?
22  A. I would say maybe about a half-hour.
23  Q. What happened after you spoke with Ms.
24 Williams?

Page 59

1  A. She had said that she would have a human
2 resources person from Blue Bell give me a call. I
3 stated that I did not want to go back to the unit
4 because I felt threatened, and she told me that I can
5 leave that day and go home, you know, take a half a
6 day vacation, and that the human resources person from
7 Blue Bell would be calling me at home.
8  Q. Did you go home?
9  A. Yes, I did.
10  Q. Did Heather Roche also go home?
11  A. Yes.
12  Q. Did you speak to Heather Roche at all after
13 you left the HR department?
14  A. She had called me when she got home.
15  Q. Describe that conversation, please.
16  A. We had discussed all the events that had
17 happened regarding what was said, you know, with
18 Theresa Day and Edith Taylor, and at the time, we
19 decided to do a letter, you know, type up a letter
20 which, I believe, was in what I had gave you.
21  Q. Who wrote the letter?
22  A. Heather Roche did.
23  Q. While she was speaking to you; do you know?
24  A. I don't know if she was writing when we were

Page 60

1 talking.
2  Q. Is Ms. Roche still employed by Aetna?
3  A. No.
4  Q. She resigned; is that true?
5  A. Yes.
6  Q. Do you know why she resigned?
7  A. I would have to guess because it's personal,
8 but I don't know offhand.
9      (Whereupon exhibit P-10 was marked for
10 identification.)
11 BY MS. WEITZ:
12  Q. Do you recognize P-10?
13  A. Yes.
14  Q. Is that the complaint that Ms. Roche
15 drafted, to your knowledge?
16  A. Yes.
17  Q. I want to call your attention to the second
18 page. There are initials on the bottom.
19  A. Yes.
20  Q. Is that your initials, L.B.?
21  A. Yes.
22  Q. In a couple places in the document, there's
23 crossed out words that were changed. Is that your
24 handwriting or Ms. Roche's, to your knowledge?

LISA M. BAILY                    CondenseIt! ™                    BAILY VS. AETNA, INC.

Page 67

1 exhibit-10?
2    A. No.
3    Q. You said that when Ms. Williams allowed you
4 to go home, she said someone would be calling you from
5 Blue Bell; is that correct?
6    A. Yes.
7    Q. Did someone call you?
8    A. Yes, later on that day.
9    Q. Later on on August 1st?
10    A. I believe it was that day, yes.
11    Q. Who called you?
12    A. I don't remember what her name was.
13    Q. If I said it was Kim Ebert, does that sound
14 correct?
15    A. Yes, I believe it was.
16    Q. Did she say that she was calling to
17 investigate her complaint or tell you why she was
18 calling?
19    A. She had basically called and said that they
20 were going to look into it, and then she would call me
21 back, and I was to stay home the next day, and she
22 would call me back the next day to let me know when I
23 was to return to work.
24    Q. Did you give any information to Ms. Ebert?

Page 66

1 stated to him about how upset I was.
2    Q. Look at the last sentence of the second
3 page. It says, "We are tired of the harassment,
4 disrespect and now threatening treatment we are
5 receiving from basically a few workers in unit 73-P."
6 Do you see that?
7    A. Yes.
8    Q. Did I read that correctly?
9    A. Yes.
10    Q. Other than what you testified to, if there's
11 anything else, what does the last sentence mean,
12 disrespect and threatening treatment that you received
13 from a few workers in unit 73-P?
14    A. Just what I had stated before.
15    Q. Was this exhibit P-10 given to anyone, to
16 your knowledge, at Aetna?
17    A. As I stated, I believe she gave it to Warren
18 Furry. I'm not sure though.
19    Q. When?
20    A. I believe maybe the 1st or the 2nd. I don't
21 remember.
22    Q. The 1st or the 2nd of August?
23    A. Yes.
24    Q. Were you present when she gave plaintiff's

Page 68

1    A. I don't recall right at this moment.
2    Q. Do you recall whether or not you were on the
3 other line when she called?
4    A. I believe I was with Heather Roche.
5    Q. Do you recall whether or not you rushed Ms.
6 Ebert off the phone because you were on the other
7 line?
8    A. No, I don't recall.
9    Q. Did you ever speak to Ms. Ebert again?
10    A. I spoke with her, I believe it was the next
11 day, when she told me that I was to go into work and
12 report to Warren.
13    Q. Did she tell you what time? I mean, what
14 time did she call?
15    A. I don't recall. I believe it was in the
16 morning.
17    Q. Did she tell you what time to go in and see
18 Warren?
19    A. She told me that Warren would be calling --
20 If I remember, she said Warren would call me and tell
21 me what time to come in.
22    Q. Do you remember anything else from that
23 phone call with Ms. Ebert on the morning of August
24 2nd?

DENNIS CORSI COURT REPORTING                    Page 65 - Page 68

LISA M. BAILY        Condenselt!        BAILY VS. AETNA, INC.

Case 2:02-cv-05153-LDD   Document 12-2   Filed 02/06/2003   Page 17 of 32

Page 69

1    A. I don't recall.
2    Q. You don't recall her saying what the results
3 of the investigation were or what she found out?
4    A. No.
5    Q. Was your husband on the phone at the time
6 that Ms. Ebert called on August 2nd, 2001?
7    A. I believe he was at that time. I believe
8 that he was at the time.
9    Q. Do you recall what he said to Ms. Ebert?
10   A. I believe he was just going to ask her some
11 questions, but I don't know.
12   Q. I'm sorry.
13   A. I believe he wanted to ask her some
14 questions about what was going on, but I don't
15 recall.
16   Q. Do you recall what his questions were?
17   A. No, because he didn't ask her anything
18 because she had told him that she could not speak with
19 him.
20   Q. Do you recall your husband's tone of voice
21 when he spoke to Ms. Ebert?
22   A. No, I don't.
23   Q. Do you recall whether or not he yelled at
24 her?

Page 70

1    A. I don't recall that.
2    Q. At some point, did Mr. Furry call you?
3    A. Yes.
4    Q. Do you know when?
5    A. I believe it was late morning, but I don't
6 recall now.
7    Q. Do you recall what he said to you?
8    A. He told me what time to come in the office,
9 and that he would discuss things with me at that time.
10   Q. Did you come into the office?
11   A. Yes.
12   Q. Did anyone come with you?
13   A. No.
14   Q. Did you meet with Mr. Furry?
15   A. Yes.
16   Q. Was anyone else present?
17   A. No.
18   Q. Again, this is on August 2nd; is that
19 correct?
20   A. Yes.
21   Q. Can you describe what happened during that
22 conversation?
23   A. He had told me that they, more or less, were
24 not going to do anything regarding the issue of what

Page 71

1 Edith said because she didn't say anybody's name when
2 she made that statement, so they didn't feel that was
3 a threat, and that I was going to be able to move to
4 another unit, which was the unit right next door to
5 where I was sitting, but it was in the same division,
6 and I had told him that later that afternoon, and
7 because of how stressed out I was, he may be putting
8 me out on disability, so he gave me disability.
9    Q. Anything else you remember from that
10 conversation with Warren Furry?
11   A. I don't recall at the moment.
12   Q. What unit were you going to switch to?
13   A. I don't know the unit, but I know it was
14 basically sitting right next to where I was sitting
15 before.
16   Q. Did it have a different supervisor?
17   A. Yes.
18   Q. Who was the supervisor?
19   A. Tricia Maroun.
20   Q. Had you ever worked with Ms. Maroun before?
21   A. Yes.
22   Q. When?
23   A. I would help out in her unit with the
24 backlog and their work.

Page 72

1    Q. Did you have any problems with Ms. Maroun
2 before you were transferred to her unit?
3    A. I never really dealt with her, besides with
4 the work.
5    Q. Anything else from that meeting with Mr.
6 Furry that you had with him on August 2nd?
7    A. No, I don't recall anything else at the
8 moment.
9    Q. You left and went to a doctor's appointment;
10 is that correct?
11   A. Yes.
12   Q. Did you ever come back to work for Aetna
13 after that day?
14   A. No.
15   Q. So you never actually worked for Ms. Maroun;
16 is that correct?
17   A. Yes.
18   Q. I mean physically in the building.
19   A. Yes, physically in the building.
20   Q. Do you know whether or not Blue Bell HR
21 conducted an investigation of your complaint?
22   A. I don't know.
23   Q. Do you know whether or not they spoke to
24 other employees in unit 73 processing?

LISA M. BAILY        CondenseIt!™        BAILY VS. AETNA, INC.

Page 73

1    A. I believe Warren Furry told me that they
2 did.
3    Q. Do you know who he spoke to?
4    A. No, I don't.
5    Q. Did you ever hear anyone in unit 73-P talk
6 about guns?
7    A. I never did.
8    Q. Did you ever hear that other employees in
9 unit 73-P spoke about guns?
10    A. The only conversation that I had regarding
11 that was after I had left with Heather Roche, and she
12 had told me that something was said to her about a
13 gun, which she had spoken with somebody else about,
14 but it was a piercing gun.
15    Q. Did you ever hear that she made a comment
16 that she wanted to borrow a gun?
17    A. Just from what she had told me.
18    Q. You said that after you left Warren Furry's
19 office that you had a doctor's appointment on that
20 day.
21    A. Yes.
22    Q. That was August 2nd, 2001; is that correct?
23    A. Yes.
24    Q. What doctor did you see?

Page 74

1    A. My primary care physician.
2    Q. What was his or her name?
3    A. I don't remember what his name was.
4    Q. If I said it was Dr. Scott Sterling, does
5 that sound familiar?
6    A. It may have been.
7    Q. Why did you go to the doctor?
8    A. Because I was stressed.  I was having
9 headaches, and I wasn't able to sleep.
10    Q. Any other reasons?
11    A. No.
12    Q. Have you ever had headaches before?
13    A. Yes.
14    Q. When?
15    A. I was under doctor's care before because I
16 had a migraine.
17    Q. For how long before August 2nd, 2001 were
18 you seeing a doctor for migraines?
19    A. April of 2000.  It may have been before
20 that.  I don't remember.
21    Q. What kind of treatment did you receive?
22    A. They put me on medication and did several
23 tests in order to try to find out what was going on
24 and why I was getting the migraines, but they just

Page 75

1 basically put me on medication.
2    Q. What medication?
3    A. I don't recall offhand.
4    Q. What tests; do you recall?  Do you recall
5 the tests being an MRI?
6    A. Yes, CAT scan and MRI.
7    Q. I'm talking about prior to August 2nd.
8    A. Yes.
9    Q. Did you also suffer from dizziness prior to
10 August 2nd?
11    A. Yes.
12    Q. What was Dr. Sterling's diagnosis on August
13 2nd, 2001; do you know?
14    A. I know he said my blood pressure was high,
15 and because of the blood pressure being high, he
16 wanted me to stay out of work for the time being.
17    Q. Did he tell you for how long?
18    A. No, he did not.
19    Q. Did he give you a doctor's note?
20    A. Yes, he did.
21    Q. Is there anything else that he said to you?
22    A. I know I had talked with him because I was
23 going to see the counselor, Shonda Bear Moralis.
24    Q. Your primary doctor on August 2nd, did he

LISA M. BAILY
CondenseIt!™
BAILY VS. AETNA, INC.

9

Page 78

1    A. Yes.
2    Q. Did you have that CAT scan?
3    A. Yes.
4    Q. Then there's a message or a notation on the
5 bottom of that page. "Call back 8-6-01. Spoke with
6 patient. She's presently doing okay. She is at
7 home. Is scheduled for a CT scan on 8-07-01." Do you
8 see that?
9    A. Yes.
10    Q. Does that refresh your recollection that you
11 spoke to the office on that date on August 8th, '01?
12    A. I believe they called me that day.
13    Q. The office called you?
14    A. Yes.
15    Q. Is that accurate, what you said on that
16 date?
17    A. Yes, I believe so.
18    Q. What did the CAT scan show, to your
19 knowledge?
20    A. I was told it came back normal.
21    Q. After this date, August 2nd, 2001, do you
22 recall whether or not you went back to your Northern
23 Valley Primary Care & Walk-in Center primary care
24 physician?

Page 80

1    Q. How about your migraines; do you still have
2 them?
3    A. No.
4    Q. When did they stop?
5    A. I would say sometime in September.
6    Q. Of 2001?
7    A. Yes.
8    Q. You also stated that you received treatment
9 from Shonda Bear Moralis; is that correct?
10    A. Yes.
11    Q. She's a social worker; is that correct?
12    A. I don't know.
13    Q. Is she a physician, to your knowledge?
14    A. I don't know.
15    Q. Do you know when you saw Ms. Bear Moralis?
16    A. I don't remember the dates that I saw her.
17 I saw her several times in August.
18    Q. 2001?
19    A. Yes.
20    Q. Did you ever see her after August of 2001?
21    A. No.
22    Q. How were you referred to Ms. Bear Moralis?
23    A. I was given the name by Aetna.
24    Q. I'm sorry.

DENNIS CORSI COURT REPORTING

Page 81

1  A. By Aetna, I was given the name.
2  Q. From an employee assistance program or
3 something like that?
4  A. Yes.
5  Q. Do you know when you were given the name?
6  A. I don't remember if it was the 1st or 2nd of
7 August.
8  Q. Did you call EAP? Is that what happened?
9  A. Yes.
10  Q. What happened during that conversation when
11 you called EAP?
12  A. I had explained to them what was going on
13 and stuff, and that I wanted to see a counselor
14 regarding how stressed I was.
15  Q. Do you recall how many times you saw Ms.
16 Bear Moralis?
17  A. No, I don't.
18  Q. Was it more than three?
19  A. I believe it was.
20  Q. More than five?
21  A. I'm not sure on that.
22  Q. Other than Ms. Bear Moralis and your primary
23 care physician, did you see any other physicians in
24 August of 2001?

Page 82

1  A. No.
2  (Whereupon exhibit P-12 was marked for
3 identification.)
4  MS. WEITZ: P-12 is a handwritten
5 letter on Barton Counseling letterhead signed Shonda
6 Bear Moralis, LSW.
7 BY MS. WEITZ:
8  Q. Ms. Baily, have you ever seen this document
9 before?
10  A. No.
11  Q. In the first sentence, it says that Ms.
12 Shonda Bear Moralis has seen you on August 13th,
13 2001. Do you have any reason to doubt that?
14  A. No, I don't.
15  Q. Do you recall that session?
16  A. Kind of, you know, a little bit, but not
17 much.
18  Q. Do you recall that August 13th was your
19 first session with Ms. Moralis?
20  A. I believe it might have been, yes.
21  Q. Can you describe what you told Ms. Moralis
22 during that session?
23  A. I discussed with her all the issues that
24 were going on at the time; the problems that I had

Page 83

1 with human resources with the disability. They had
2 denied the disability because they somehow didn't get
3 the fax that my primary care physician had faxed to
4 them. Somehow they said that they never received it,
5 even though it was faxed by my primary care
6 physician. I discussed with her how stressed out that
7 that made me because then I had to go through the
8 hassle of having it re-faxed again.
9  Q. Anything else that you discussed with Ms.
10 Bear Moralis?
11  A. Just how I was feeling at the time because
12 of everything that had happened.
13  Q. What everything?
14  A. As far as with the harassment between
15 Theresa Day and Edith Taylor, and just my feelings,
16 you know, how upset that got me because of how I was
17 being treated at work.
18  Q. Anything else you recall discussing with Ms.
19 Bear Moralis?
20  A. At the moment, I can't recall any.
21  Q. It says that you were scheduled again to see
22 her on August 24th, 2001 in P-12. Do you recall
23 that?
24  A. Yes.

Page 84

1  Q. Did you see Ms. Moralis again on August
2 24th, 2001?
3  A. I believe I may have, but I don't recall the
4 next day that I went to see her.
5  Q. After August 24th, 2001, did you ever see
6 Ms. Bear Moralis again?
7  A. I believe I may have saw her one more time.
8 I don't remember.
9  Q. Other than what you've testified to, on the
10 other occasions that you saw Ms. Bear Moralis, can you
11 recall what you discussed with her? Did you discuss
12 anything with her after August 13th that you didn't
13 mention before?
14  A. I don't recall all the discussions I had
15 with her.
16  Q. I'm sorry.
17  A. I don't recall what I had said to her
18 besides that. There may have been other things, but I
19 don't remember.
20  Q. Did you make a claim for disability or
21 disability leave after August 2nd, 2001?
22  A. Yes.
23  Q. How did you go about doing it?
24  A. Warren Furry, when I had the meeting with

LISA M. BAILY                     CondenseIt!™                     BAILY VS. AETNA, INC.

Page 85

1 him, had given me the number to disability, and I had
2 called them.
3    Q. When did you call them?
4    A. I don't remember if it was August 2nd or
5 not.
6    Q. Is that the call center; do you know?
7    A. It might be. I don't know.
8    Q. Some kind of hot line or call center that
9 you would call?
10    A. It might have been. I don't remember.
11    Q. Was anyone else on the line when you
12 called?
13    A. No.
14    Q. Do you remember who you spoke to?
15    A. No, not at that time.
16    Q. Did you take any notes of your
17 conversation?
18    A. Just with who I spoke with, which, I
19 believe, I had sent to you. I don't remember if it
20 was that phone call or on one of my other phone calls,
21 but I did that.
22    Q. Do you remember what you told the person
23 from the call center or the hot line?
24    A. I just discussed with them about the

Page 86

1 disability and what to do with that, but I don't
2 recall anything else.
3    Q. Do you remember what they told you about how
4 to file a disability claim?
5    A. Off of top of my head, I don't remember.
6    Q. Did you tell them why you had to go on
7 disability?
8    A. I don't remember if I gave a reason or not.
9 I may have just told them it was stress. I don't
10 know.
11    Q. Do you recall them telling you what you had
12 to do to go about filing a claim? Was it enough that
13 you called? Did you have to send them anything?
14    A. Yes. I believe she may have given me a fax
15 number that I could have my primary care doctor fax a
16 letter to.
17    Q. Did you have to sign a release or anything
18 like that to get the information faxed from your
19 health care physician; do you recall?
20    A. I believe I did, yes.
21    Q. Did you have to go to your physician's
22 office to do that?
23    A. Yes.
24    Q. Do you remember when you did that?

Page 87

1    A. No, I don't remember what date it was.
2    Q. After this phone call and you signed the
3 release for records, do you remember what happened
4 next with your disability claim?
5    A. I got a letter stating that it was denied;
6 that I had to call disability and ask them why it was
7 denied, and they said that they never received any
8 information from my primary care doctor.
9        (Whereupon exhibit P-13 was marked for
10 identification.)
11        MS. WEITZ: P-13 appears to be a letter
12 from Aetna Disability Services to Lisa M. Baily dated
13 8-10-01.
14 BY MS. WEITZ:
15    Q. Ms. Baily, is this the letter or the
16 certification decision that you received denying your
17 disability claim?
18    A. Yes.
19    Q. And you received this document?
20    A. Yes.
21    Q. Do you know when you received this?
22    A. It may have been like the 12th or 13th.
23    Q. Of August?
24    A. Of August.

Page 88

1    Q. You stated earlier that you took notes of
2 the conversation.
3    A. Yes.
4    Q. I'm turning to page two of P-13. Are these
5 the notes that you were referring to?
6    A. Yes.
7    Q. I'm turning to the note 8-14-01, Barbara.
8 Is Barbara the individual you spoke to about the
9 denial?
10    A. Yes, I believe it was.
11    Q. Do you recall everything she told you?
12    A. It was denied because they didn't receive
13 any information, so I asked her what I had to do, and
14 she told me I should have the doctor re-fax
15 everything, and I called my doctor after I got off the
16 phone with her and asked if he had faxed anything yet,
17 and he had said, yes, and I explained that they never
18 received it, and can he fax it again. I had given my
19 primary care doctor the phone number that Barbara had
20 given me along with the name so that I could get it to
21 her attention.
22    Q. To your knowledge, was it re-faxed to
23 Aetna?
24    A. Yes.

DENNIS CORSI COURT REPORTING                     Page 85 - Page 88

LISA M. BAILY    Case 2:02-cv-05153-LDD    Document 12-2    Filed 02/06/2003    Page 22 of 32    BAILY VS. AETNA, INC.

CondenseIt!™

Page 89

1   Q. Do you know when it was re-faxed?
2   A. I was told by my primary care doctor that it
3 was going to be done that day on the 14th.
4   Q. Did you ever verify to make sure it was
5 faxed or received by Aetna?
6   A. I believe I had called back to verify that
7 it was sent, which was on the 17th.
8   Q. Were you given any information at that time
9 when you called back concerning how long it would take
10 before the claim was decided?
11   A. I believe they told me that it would take
12 five days for them to make a determination.
13   Q. During this period through August 14th of
14 2001, you weren't fired; is that correct?
15   A. Correct.
16   Q. You still remained an Aetna employee;
17 correct?
18   A. Yes.
19   Q. And you were still receiving benefits; is
20 that correct? Your health insurance wasn't canceled;
21 was it?
22   A. No.
23   Q. What happened next? What's your
24 recollection?

Page 92

1   Q. The first time it was approved, was it
2 approved from August 31st, or was it approved from
3 August 2nd to August 7th?
4   A. The first time for just a couple days.
5     (Whereupon exhibit P-14 was marked for
6 identification.)
7 BY MS. WEITZ:
8   Q. Do you recognize P-14?
9   A. Yes.
10     MS. WEITZ: For the record, plaintiff
11 produced only the first page, which is the last page
12 of this attachment, Baily 083, and I attached the
13 first page and the second page of the certification.
14 I don't know if you lost the second page or if it
15 wasn't produced. P-14 is a letter from Aetna
16 Disability Services to Lisa Baily dated 8-20-01.
17 BY MS. WEITZ:
18   Q. You received this document; is that correct?
19   A. Yes.
20   Q. It notes that your short-term disability had
21 been approved from August 2nd through August 7th,
22 2001; is that correct?
23   A. Yes.
24     (Whereupon exhibit P-15 was marked for

Page 93

1  identification.)

2      MS. WEITZ: P-15 has been identified,
3  which is an interoffice communication from Tricia
4  Maroun to Lisa Baily dated 8-21-01.
5  BY MS. WEITZ:
6      Q. You produced this document; is that
7  correct?
8      A. The first time that I saw this was when my
9  lawyer got my personnel file. I never saw this
10 before. This was in my personnel file that he
11 received from Aetna.
12     Q. You never received this document?
13     A. I never received this document. That's why
14 I had no knowledge of it.
15     Q. After you received the certification
16 concerning your approval from 8-2 to 8-7-01, did you
17 attempt to extend your benefits or get more short-term
18 disability?
19     A. I had asked them at disability what I had to
20 do to get the rest of my dates approved and stuff, and
21 they told me the doctor would need to give them more
22 information, which, I believe, I told my doctor.
23     Q. Do you recall what doctor you told?
24     A. I believe they had told me that they needed

Page 94

1  more information from my primary care doctor, so I had
2  called them in order to get more information sent.
3      Q. Do you recall whether or not they sent
4  additional information?
5      A. From what I was told from my primary care
6  doctor's office, they did.
7      Q. After August 7th, 2001, had you seen your
8  primary care doctor again?
9      A. Yes, but I don't remember what date it was.
10     Q. Did you submit additional information from
11 Ms. Bear Moralis or Barton Counseling regarding your
12 short-term disability claim?
13     A. I don't remember if she had to submit
14 anything else.
15     Q. Do you recall whether she submitted anything
16 at all?
17     A. I know she had to submit that note that you
18 had given me, but I think she had to fax that twice
19 because the first one got lost.
20     (Whereupon exhibit P-16 was marked for
21 identification.)
22 BY MS. WEITZ:
23     Q. Do you recognize P-16?
24     A. I never saw this before.

Page 95

1      Q. So you don't know whether or not this is a
2  letter sent from Shonda Bear Moralis to Doug Adams; is
3  that correct? You didn't receive a copy of this?
4      A. I never saw a copy of this, but she told me
5  she had faxed them something.
6      Q. Did you ever call the hot line to find out
7  whether or not your extension had been approved?
8      A. Yes, after I had called, and I had kept
9  checking up on it.
10     Q. Who did you speak to?
11     A. I don't remember.
12     Q. Do you recall any of the people that you
13 spoke to?
14     A. Just the names that I have written down on
15 that sheet.
16     Q. So you recall speaking to Marie and Doug on
17 August 30th, '01?
18     A. Yes.
19     Q. On August 31st, you spoke to a Linda. Do
20 you recall that?
21     A. Vaguely.
22     Q. Do you recall the August 30th conversation
23 with Marie or Doug?
24     A. I don't recall what was said, no.

Page 96

1      Q. I'm going to turn your attention to P-13 on
2  the second page where you have notes of the
3  conversation. Am I correct that under the 8-30 date,
4  you said it was not denied. It was still in review.
5  Correct?
6      A. Yes. That's what they must have told me at
7  the time.
8      Q. Then under September 4th, '01, you also
9  spoke to a Linda; is that correct?
10     A. Yes.
11     Q. Do you recall that conversation?
12     A. I think I just called to ask what was going
13 on with it, and she told me it was still being
14 reviewed.
15     Q. That the nurses had it, and it was being
16 reviewed?
17     A. Yes.
18     Q. At some point, were you approved for your
19 short-term disability benefits through the end of
20 August?
21     A. Yes, eventually, I was.
22     Q. Do you recall your husband calling the call
23 line at all during this period of time?
24     A. I know he had called because there was

## Page 97

1 several times that I could not call to check up on it,
2 and he was calling just to see if it was approved or
3 denied.
4        MS. WEITZ: Excuse me.
5        (Discussion held off the record.)
6 BY MS. WEITZ:
7    Q. Were you present when he made any of the
8 phone calls?
9    A. No.  I was at work.
10   Q. What did your husband tell you that he had
11 said to the individuals on the call line?
12   A. I know he had told me that he had asked
13 whether it was approved or denied, and I think he
14 asked how long is it going to take.  Other than that,
15 I don't recall.
16   Q. Do you know whether or not he ever
17 threatened anyone on the call line?
18   A. No, I don't.
19   Q. How did you find out that your disability
20 had been approved through 8-31-01?
21   A. I just had to keep calling and check on it.
22   Q. Do you know whether you were told or your
23 husband was told?
24   A. I don't remember.

## Page 98

1    Q. Did you receive something in the mail?
2    A. Yes.
3        (Whereupon exhibit P-17 was marked for
4 identification.)
5        MS. WEITZ: P-17 is a letter from Aetna
6 Disability Services to Lisa Baily dated 9-21-01.  The
7 third page is the first page of this letter that was
8 produced by Ms. Baily.
9 BY MS. WEITZ:
10   Q. Do you recognize P-17?
11   A. Yes.
12   Q. And you received it?
13   A. Yes.
14   Q. Did you ever seek additional benefits past
15 8-31?
16   A. No.
17   Q. Were you eventually paid in full for your
18 time that you were out of work from August 2nd, 2001
19 through August 31st, 2001?
20   A. After it was approved, yes.
21   Q. Did you ever file a complaint with anyone in
22 the human resources department concerning the delay or
23 your problems getting your short-term disability
24 benefits?

## Page 99

1    A. I believe that I spoke with Doug Adams'
2 supervisor because the faxes that my doctor was
3 sending kept getting lost.
4    Q. How many times did they have to fax them?
5    A. At least twice.
6    Q. Other than that, did you file any complaint
7 concerning the delay in getting benefits?
8    A. We had spoke with a supervisor regarding it
9 only because we felt that it was just taking so long
10 in getting done because it took almost two months to
11 get done.
12   Q. Did you complain about anything else?
13   A. No.
14   Q. Did you ever initiate Aetna's dispute
15 resolution process concerning your problem with
16 getting disability benefits or the delay in getting
17 disability benefits?
18   A. I don't know what that is.
19   Q. At some point, you submitted an Aetna Family
20 Leave and Family Medical Leave Request; isn't that
21 true?
22   A. Yes.
23        (Whereupon exhibit P-18 was marked for
24 identification.)

Page 101

1    A. We were told that that was the purpose of us
2 signing that so they would go in our personnel file.
3    Q. Anything else that was not put in your
4 personnel file?
5    A. This paper was not.
6    Q. Do you know whether or not family medical
7 leave requests were kept in personnel files?
8    A. No, I don't.
9    Q. So you filled out the front of P-18; is that
10 correct?
11    A. Yes.
12    Q. Did you submit it to Aetna?
13    A. I sent it, yes.
14    Q. In the mail?
15    A. Yes.
16    Q. On the back page is a handwritten note; is
17 that correct?
18    A. Yes.
19    Q. The handwritten note says, "As requested by
20 my lawyer, here's my request for a family and medical
21 leave, as I was not told that I was allowed to have
22 this done until later by my lawyer."
23    A. Yes.
24    Q. Why did you submit your family and medical

Page 103

1 I was not approved. I was on leave, and I had to call
2 her every single day while out, and she always told me
3 my leave wasn't approved, and I felt like it should
4 have been because my doctor told me to stay out, so I
5 was out on his leave. Things that I found out
6 afterwards with the family and medical leave. You're
7 not supposed to get harassed, which calling your
8 supervisor every single day when they know you're out
9 to have to call is being harassed.
10    Q. You were not fired from Aetna; is that
11 correct?
12    A. I gave my resignation because of --
13    Q. That's not what I'm asking. I'm asking:
14 You were not fired from Aetna; is that correct?
15    A. Correct.
16    Q. Through August 31st, you still had a job at
17 Aetna; is that correct?
18    A. Yes.
19    Q. And through August 31st, and I'm not talking
20 about your disability benefits, you were still on
21 Aetna's benefits; correct?
22    A. Yes.
23    Q. You still received health care; is that
24 correct?

Page 104

1    A. Yes.
2    Q. You never had a doctor say to you that this
3 bill came back, and it wasn't paid, and you were taken
4 off the rolls or anything like that?
5    A. Yeah.
6    Q. You did or you didn't?
7    A. I never had that happen.
8    Q. Did you ever hear any type of response from
9 Aetna with respect to your family medical leave
10 request?
11    A. No.
12    Q. You submitted this request after you
13 resigned; is that correct?
14    A. Yes, because I was told to.
15    Q. By your attorney?
16    A. Yes.
17        MS. NENNI: Objection.
18        Don't answer questions about what you
19 were told and not told by your attorney.
20        MS. WEITZ: She wrote it right here.
21        MS. NENNI: I understand.
22 BY MS. WEITZ:
23    Q. Who was your attorney at the time?
24    A. Mr. Russo.

Page 105

1  Q. When did you first meet with him?
2  A. Sometime in September.
3  Q. This document is dated August 31st, '01.
4  A. Yes.
5  Q. Did you backdate it, or did you meet with
6  him? You resigned on August 31st.
7  A. I believe it was toward the end of August.
8  Q. How did you get this application?
9  A. I had called human resources, and they sent
10 it to me.
11 Q. Do you recall what happened during that
12 discussion with human resources?
13 A. Human resources told me to go on line in
14 order to receive it or have them send it, and I had to
15 have it sent to me, and the lady there at human
16 resources said that it was a disability claim, not a
17 family and medical leave, so there was no need for me
18 to fill it out.
19 Q. You had the Aetna benefit booklet at the
20 time; is that correct?
21 A. I believe so, yes.
22 Q. Did you ever go through the benefits booklet
23 and look at the processes for the different types of
24 leave of absences given by Aetna?

Page 106

1  A. I don't remember. I did, but I don't
2  remember what I reviewed.
3  Q. Did you review the difference between a
4  disability leave, family and medical leave under the
5  Aetna plan?
6  A. I know I reviewed the disability, but the
7  family and medical leave I didn't look at because I
8  was told I wasn't allowed to have family and medical
9  leave while I had disability.
10 Q. When you applied for disability on August
11 2nd, did you ever look at the other family medical
12 leave or the other medical leave policies that Aetna
13 had in place?
14 A. I don't recall doing so, no.
15    (Whereupon exhibit P-19 was marked for
16 identification.)
17 BY MS. WEITZ:
18 Q. Do you recognize P-19?
19 A. Yes.
20 Q. They're notes of a conversation with a
21 Grace; is that correct?
22 A. Yes.
23 Q. Do you know when you had this conversation
24 with Grace?

Page 107

1  A. I don't recall the date, no.
2  Q. Why did you call her?
3  A. I believe I called to find out about the
4  family medical leave and to get the paperwork sent to
5  me.
6  Q. This note seems to stop right in the middle;
7  is that correct?
8  A. Yes.
9  Q. Do you recall anything else that was said
10 during that conversation?
11 A. No, I don't.
12 Q. Is this an accurate statement of what Grace
13 said during the conversation that you took down?
14 A. It's not word for word, but that's what she
15 told me when I would speak with her.
16 Q. She said that family and medical leave
17 doesn't pay anything. It's just getting certified so
18 you don't get penalized.
19 A. Yes.
20 Q. Were you penalized for any days?
21 A. I don't know if I was or not.
22 Q. Then the next page says, "Grace, spoke with
23 her. Asked to speak with Towanda Mosey, extension
24 32670. She tried, but she was not there."

Page 108

1  A. Yes.
2  Q. Is this note of a phone call on a different
3  day?
4  A. Yes. Towanda Mosey called me, and she had
5  called my house and told me on my machine to return
6  her phone call, and I called her back regarding what
7  she called me about, and she wasn't in at the time.
8  Q. Do you know what Towanda Mosey wanted to see
9  you about?
10 A. I believe it was about the pay; once my
11 disability was approved, about my pay.
12 Q. Do you know whether or not your time between
13 August 2nd, 2001 and August 31st, 2001 was designated
14 by Aetna as FMLA leave time?
15 A. No, I don't.
16    MS. WEITZ: This is a good point to
17 break.
18    MS. NENNI: Okay.
19    (Break taken in the proceedings from
20 1:08 PM to 1:47 PM.)
21 BY MS. WEITZ:
22 Q. You testified earlier that Ms. Maroun
23 harassed you while you were out on leave or in August
24 of 2001. Can you describe in detail what you mean by

Page 109

1 harassing you?
2    A. She basically, especially toward the last
3 week or two weeks maybe --
4    Q. In August?
5    A. In August. She told me I had to call every
6 single day, or I had to speak with her every single
7 day, and the way she said it was very nasty. I mean,
8 it could have been said in a more professional way to
9 me. She didn't tell me like what time that I had to
10 call or anything. She just said I had to speak with
11 her every day. She did not say, you know, in the
12 morning or afternoon or whatever, and there was one
13 incident when I was going to call her, I was busy
14 doing things in the morning, and I was going to call
15 her in the afternoon, but in turn, she had called me,
16 and she was very nasty about the fact that I didn't
17 call her yet. She said, "Well, you have to call in
18 the morning." I explained to her that she did not
19 tell me I had to call in the morning. She just told
20 me I had to call and speak with her every single day.
21 She did not tell me that I had to call in the morning
22 or I had to call in the afternoon. So, you know, I
23 just explained to her that I was going to be calling
24 her in the afternoon if I had other things to do in

Page 110

1 the morning, which is why I didn't call her before she
2 called me that day. I don't remember what day it
3 was. To me, it didn't need to be done that way. The
4 way she said it was in a harassing way because of how
5 rude she was about it.
6    Q. How was she rude?
7    A. Her tone. "Well, you should have called me
8 in the morning." Well, I'm sorry, but she did not
9 tell me that. She did not tell me when I had to call
10 her. She said I had to call her every day, not in the
11 morning.
12    Q. How was she unprofessional?
13    A. In her tone and how she talked to me.
14    Q. Can you explain to me any further about how
15 she talked to you?
16    A. It was in a very rude, unprofessional
17 manner. Instead of saying it the way she said it, she
18 could have been more professional about saying it the
19 way she had.
20    Q. Anything else that Ms. Maroun did that you
21 consider to be harassing?
22    A. No, not that I can think of right now.
23    Q. I think you testified much earlier, and
24 correct me if I'm wrong, please, that Ms. Maroun

Page 111

1 became your supervisor or you were informed that she
2 was your supervisor on August 8th; is that correct?
3    A. I know it was either around that time or the
4 middle of August.
5    Q. Or the middle of August?
6    A. Yes, sometime in between there.
7    Q. How did you learn that Ms. Maroun had become
8 your supervisor?
9    A. She had called me and left a message on my
10 answering machine stating that she was officially my
11 supervisor.
12    Q. Do you have any record of what day that
13 was?
14    A. I believe it was around the 8th or the
15 12th. It was between that date.
16    Q. Did she ask you to call her back?
17    A. Yes, she did.
18    Q. Did you call her back?
19    A. Yes, I did.
20    Q. What happened during that conversation?
21 What's your recollection?
22    A. She had called and told me that the
23 disability was denied, and I had spoke to her, and I
24 said, "Yeah, I just received a letter stating it was

Page 112

1 denied", and I was calling them to find out what I had
2 to do. She said to keep her informed as to what's
3 going on with it, and she would call me back and
4 continue to call me, or I can call her to let her know
5 what was going on also.
6    Q. When you say that it was after you received
7 that notice that it was denied, is that the notice
8 marked P-18?
9    A. Yes.
10    Q. So sometime after you received this notice?
11    A. Yes.
12    Q. Did anything else happened in that initial
13 conversation with Tricia Maroun?
14    A. I don't recall anything else. I told her
15 that I was going to be calling disability to see what
16 I had to do.
17    Q. You said that she had told you at some point
18 that you have to call her every day; is that correct?
19    A. Yes.
20    Q. Was that during this conversation?
21    A. No, it was not.
22    Q. When was that conversation with Ms. Maroun?
23    A. I don't remember the date. It was maybe a
24 week-and-a-half or so before I gave them my

Page 113

1  resignation.
2      Q. Would you pull out plaintiff's exhibit-14?
3  Do you recall whether or not the conversation with Ms.
4  Maroun that you had to call in every day occurred
5  before or after you received the certification
6  decision, which is P-14?
7      A. I believe it was after that.
8      Q. After you received that?
9      A. Yes, after I received this.
10     Q. Between the time that you were informed that
11 she was your supervisor and the time that she told you
12 you had to call in every day, did you have any contact
13 with Ms. Maroun?
14     A. I don't remember if I did or not between
15 that time.
16     Q. I'm going now to this conversation after
17 8-20, the date of the certification letter, where you
18 had the conversation with Ms. Maroun. Who called
19 whom?
20     A. I don't remember if she had called me or if
21 I called her first. I don't remember.
22     Q. Please, describe in full that conversation.
23     A. I know I talked to her, and I believe I had
24 told her that I had already spoken with disability and

Page 114

1  discussed with them what I needed to do in order for
2  me to get more days, and I told her I was continuing
3  with that, and I don't remember if it was that
4  conversation or not that she told me that my leave was
5  not approved.
6      Q. Your extended leave was not approved?
7      A. My leave; that I was currently out on an
8  unapproved leave of absence.
9      Q. As of what date, to your knowledge?
10     A. She didn't give me any date. She just said
11 that currently I was out on an unapproved leave of
12 absence.
13     Q. What else did she say during that
14 conversation?
15     A. I don't remember if she told me to keep her
16 informed or what happened. I believe it may have been
17 that conversation where she said I had to call her
18 every single day, which I did in order to let her know
19 that I was out.
20     Q. How long did these conversations last when
21 you called her every day?
22     A. Sometimes they would last only a few minutes
23 because of the fact that she wasn't there to answer
24 her phone at the time, whatever the case may be, so

Page 115

1  sometimes they were only like a couple minutes for me
2  to leave her a message.
3      Q. How many times do you think you actually
4  spoke to her when you called in?
5      A. I don't remember.
6      Q. Was it more than five?
7      A. I don't believe it was. I know I called her
8  every single day, and I told her if she needed to
9  speak to me, you have to call me back.
10     Q. Did she ever call back?
11     A. I don't remember her ever calling, except
12 maybe the one time. I believe that was the only time
13 she called me back. It may have been twice. I don't
14 remember how many times she called me back.
15     Q. Was it more than three times that you
16 actually spoke to Ms. Maroun?
17     A. I can't remember how many times I spoke with
18 her actually.
19     Q. Other than the one time when she called you
20 because you didn't call in the morning, can you
21 describe what the substance of your conversations with
22 Ms. Maroun were when you would call her?
23     A. I would just tell her that, you know, I'm
24 still out, and that I wasn't going to be in because I

Page 116

1  guess she had to know if I was coming in or not, and I
2  just basically left a message as far as that goes,
3  that I was still out, and I don't know for how much
4  longer I'll be out.
5      Q. What would she say?
6      A. As I stated, most of the time, I left a
7  message.
8      Q. Was there any time that you just told her
9  that you were still out, and she responded that she
10 was actually physically there on the phone?
11     A. It may have been one time. I don't recall
12 though.
13     Q. Did you ever complain to anyone at Aetna
14 that you had to call in every day?
15     A. No.
16     Q. Did Ms. Maroun yell at you? Did she raise
17 her voice?
18     A. I wouldn't say she actually raised her voice
19 loud, no.
20     Q. Did she ever threaten you and your job in
21 any way?
22     A. No.
23     Q. Were you harassed by anyone else at Aetna
24 during this time period in August of 2001?

Page 117

1    A. I wasn't at work in order to be harassed, so
2 I had no contact with anybody.
3    Q. Except for the disability people, did you
4 have any further contact with anyone else at Aetna?
5    A. No.
6    Q. You allege in your complaint that Ms. Maroun
7 interfered with your rights under the Family and
8 Medical Leave Act. Can you describe how she
9 interfered with these rights?
10    A. I stated that only because of the fact that,
11 you know, she told me that I was you out, and my leave
12 wasn't approved because she always told me that I
13 wasn't approved. To me, she was already denying it,
14 and I didn't know if she was denying it because of
15 disability or what, but she was just basically denying
16 it, and she basically told me my leave wasn't
17 approved.
18    Q. Did she tell you that she made that decision
19 or that someone else in Aetna made that decision?
20    A. She did not tell me.
21    Q. Do you know whether it's her job
22 responsibility to make the decision on whether or not
23 your leave is approved or not approved?
24    A. No.

Page 118

1    Q. Do you have any other facts or any other
2 reason why you believe Ms. Maroun interfered with your
3 rights under the Family and Medical Leave Act?
4    A. None that I can recall.
5    Q. You also allege that Aetna interfered with
6 your rights under the Family and Medical Leave Act.
7 What facts do you have that Aetna interfered with your
8 rights under the FMLA?
9    A. Well, when I called human resources and I
10 spoke with, I believe it was Grace, she told me that
11 it wasn't a family and medical leave; that it was
12 disability. She said that the disability would have
13 to be approved first before family and medical leave
14 would take place. To me, I mean, because she told me
15 that it was disability and it wasn't family and
16 medical leave but disability, to me, that's two
17 different things. It's not the same. From what I
18 understand, it's supposed to be the same. It doesn't
19 make sense.
20    Q. What injury do you believe you suffered as a
21 result of your claim that Aetna interfered with your
22 rights under the Family and Medical Leave Act?
23    A. I would guess just all the stress it caused
24 me because of everything I had to do as far as them,

Page 119

1 you know, causing me to have stuff faxed more than one
2 time from my doctors because it was lost. You're
3 under enough stress as it is, and then to have to call
4 people constantly to get stuff re-faxed over and over
5 again, to me, it's very stressful. You're under
6 enough stress because you're out and, you have enough
7 stuff to think about and do, and then to feel like
8 you're doing someone else's job because they're
9 misplacing the paperwork, or whatever the case is,
10 that's a lot of stress for someone to go through, and
11 knowing how I was treated there with being harassed
12 and stuff, it was disappointing because of how long I
13 worked there.
14    Q. Any other injury that you think you suffered
15 as a result of Aetna's interference with your rights
16 under the Family and Medical Leave Act?
17    A. As a result, I mean, I have a job that pays
18 less because I needed a job, and I needed a paycheck.
19 I had to take something that just came along as
20 opposed to what I could have really had only because I
21 needed the money. They could have caused a lot more
22 problems than that because of all the delays and the
23 paperwork and everything else.
24    Q. Anything else?

Page 120

1    A. No, not that I can think of.
2    Q. You also make a claim in your complaint that
3 Aetna retaliated against you for trying to take FMLA
4 leave. What happened to you that you believe was
5 retaliation?
6    A. I'm trying to think. That's from Mr.
7 Russo. I don't remember what he was talking about at
8 the moment.
9    Q. You resigned your employment with Aetna; is
10 that correct?
11    A. Yes.
12    Q. Did you do it in writing or orally?
13    A. In writing. Well, actually, I had called
14 Tricia Maroun, and I told her I would be coming in in
15 order to turn in my resignation.
16    Q. Do you remember when you called Tricia
17 Maroun?
18    A. The 30th.
19    Q. Did you speak to her?
20    A. Yes, I did.
21    Q. What did she say?
22    A. I left her a message, and she had called me
23 back that day, and she had told me that she wasn't
24 going to be in; that if I wanted to come in that day

Page 121

1 in order to turn in my resignation, I could turn it in
2 to Warren Furry. I told her that I was just going to
3 drop off my resignation letter to human resources.
4    Q. Is there anything else that you recall from
5 that conversation with Tricia Maroun?
6    A. I don't recall anything else at this time.
7    Q. Did anyone at Aetna ever ask you to resign?
8    A. No.
9       (Whereupon exhibit P-20 was marked for
10 identification.)
11 BY MS. WEITZ:
12    Q. Is P-20 a copy of your resignation letter?
13    A. Yes.
14    Q. It's not signed. Was there a signed
15 version, or did you just provide it in a typed form?
16    A. I believe I provided it in a typed form. I
17 don't remember signing it.
18    Q. And that's an accurate copy of your
19 resignation letter?
20    A. Yes.
21    Q. The first sentence of P-20 states, "I, Lisa
22 Baily, am hereby handing in my resignation to Aetna
23 U.S. Health Care after being constructively discharged
24 from the company." Did anyone tell you to put

Page 122

1 constructively discharged in that letter?
2    A. Yes.
3    Q. Who?
4       MS. NENNI: Objection.
5 BY MS. WEITZ:
6    Q. Did anyone, other than your attorney, tell
7 you to put constructively discharged in that letter?
8    A. No.
9    Q. Do you know what constructively discharged
10 means?
11    A. They just told me to --
12       MS. NENNI: Objection.
13       Don't discuss any conversations that
14 you had with your attorney.
15 BY MS. WEITZ:
16    Q. Other than what Attorney Russo may have told
17 you, do you know what constructively discharged
18 means?
19    A. No.
20    Q. You also stated in the second sentence, "I
21 am being mentally harassed." Do you see that?
22    A. Yes.
23    Q. How were you mentally harassed?
24    A. With Theresa Day and Edith Taylor, I felt

Page 123

1 like I was being harassed when I was there.
2    Q. You also state, "I am belittled and
3 humiliated." How were you belittled?
4    A. I guess you can say because of the way they
5 did it. They said it loudly enough so that everybody
6 could hear.
7    Q. They meaning who?
8    A. Edith Taylor and Theresa Day. I felt like,
9 you know, with other coworkers that -- I'm trying to
10 think of the right words of how to say what I want to
11 say. I felt like because they were harassing me that
12 everybody else was looking at me because of the
13 situation.
14    Q. You say that you were humiliated. What do
15 you mean by that?
16    A. Well, because of the situation with them and
17 the things that they were saying and doing, I
18 basically felt like everybody was turning against me,
19 and because it was done in front of the area that our
20 office space is in. It's a big open area. If you say
21 things loud enough, you can hear things pretty far in
22 the area, so, to me, other coworkers were looking at
23 me and thinking I'm a bad person because of the way
24 they were acting toward me.

Page 124

1    Q. You also state that you were being forced to
2 work in conditions that are not standard quality.
3 What did you mean by that?
4    A. Because of them, especially being a
5 supervisor and not acting professional.
6    Q. Meaning Theresa Day?
7    A. Yes.
8    Q. So when you said it's because of them,
9 you're talking about Edith Taylor and Theresa Day?
10    A. Yes.
11    Q. In your last sentence you say, "It would
12 have been nice if we could have worked these issues
13 out in a more professional manner that everybody would
14 have been happy with, but since could not have been
15 achieved, please accept my resignation in its place."
16 What do you mean by "could have worked these issues
17 out in a more professional manner that everybody would
18 have been happy with"?
19    A. Especially if the supervisor would have
20 acted more professionally, none of this would have
21 happened.
22    Q. Which supervisor?
23    A. Theresa Day. If she would have acted like a
24 professional, because she was very unprofessional like

Page 125

1 a child, none of this would have happened.
2    Q. Other than what you've already testified
3 about, do you have any other facts to support your
4 claim that Aetna interfered with your rights under the
5 Family and Medical Leave Act?
6    A. I can't think of any at the moment.
7    Q. Other than what you've already testified
8 about, do you have any other facts to support your
9 claim that Aetna retaliated against you for exercising
10 your rights under the Family and Medical Leave Act?
11    A. I can't think of any right now.
12    Q. I think you testified that you work for PMA
13 Insurance now; is that correct?
14    A. Yes.
15    Q. You started with PMA Insurance on September
16 4th, 2001; is that correct?
17    A. Yes.
18    Q. Your resignation with Aetna was on the
19 Friday before Labor Day; is that correct?
20    A. Yes.
21    Q. You started with PMA on the Tuesday after
22 Labor Day; is that correct?
23    A. Yes.
24    Q. So you didn't miss any paid days of work in

Page 126

1 the end once you got paid by Aetna; is that correct?
2    A. Yes.
3    Q. When did you apply for a job with PMA?
4    A. I don't remember the exact date. It may
5 have been a week before my resignation, maybe a
6 week-and-a-half before my resignation.
7    Q. Do you recall if it was before or after your
8 notice on August 20th that you had been certified for
9 leave from August 2nd to August 7th of 2001?
10    A. I don't recall if it was.
11    Q. Did you interview with PMA Insurance?
12    A. Yes, I did.
13    Q. When did you interview with them?
14    A. I don't remember the exact date.
15    Q. While you were still employed by Aetna?
16    A. Yes.
17    Q. Did they ask you why you were leaving Aetna?
18    A. Yes, they did.
19    Q. What did you tell them?
20    A. Just that I was not satisfied with working
21 there.
22    Q. What occurred between August 31st of 2001
23 and September 4th of 2001 that made you able to work,
24 where you weren't able to work before?

Page 127

1    A. Knowing that I wasn't going to be harassed.
2 I knew that I was going to another job where the
3 harassment would not be there.
4    Q. If I'm mischaracterizing your testimony,
5 please, let me know. The reason that you were not
6 able to work on August 2nd through August 31st was
7 that you were being harassed? Is that your
8 testimony?
9    A. Because it caused me stress.
10    Q. How did your stress make you unable to
11 perform your job?
12    A. Because I was having headaches, and I was
13 not able to sleep.
14    Q. How did that affect the ability to do your
15 job?
16    A. I sat at a computer all day. I cannot work
17 if I can't see the screen, and I had migraines.
18    Q. Did you have a migraine every day from
19 August 2nd to August 31st?
20    A. Just about, yes.
21    Q. On September 1st, did your migraines go
22 away?
23    A. I can't say that went away immediately, but
24 they did go away.

Page 128

1    Q. Were you able to do your job at PMA
2 Insurance?
3    A. Yes.
4    Q. Did you lose any time from migraines?
5    A. No.
6    Q. When you left on August 2nd, 2001, did you
7 plan on ever returning back to work for Aetna?
8    A. I wasn't sure what I was doing at the time.
9 I was going day by day.
10    Q. When were you hired by PMA?
11    A. I don't remember the date I was hired. It
12 was probably within a week of my resignation letter.
13    Q. Did you ever inform anyone at Aetna during
14 that period of time that you would no longer be
15 working there?
16    A. No.
17    Q. Other than PMA, did you apply for jobs
18 anywhere else while you were on leave from Aetna?
19    A. I believe I applied for a job at Sperion.
20 It's like a temp service type thing.
21    Q. Do you know when you applied for that job?
22    A. No, I don't remember.
23    Q. Do you have copies of your applications for
24 Sperion or PMA?

**Page 129**

1   A. No.
2   Q. How did you find out about jobs?
3   A. In the paper.
4   Q. Were there advertisements in the paper?
5   A. Yes.
6   Q. Do you have copies of the advertisements?
7   A. No.
8   Q. Were you interviewed for the job at
9 Sperion?
10   A. When I went in to fill out the application,
11 they interviewed me, but they told me at the time that
12 they didn't have anything available because it was a
13 temp service type thing, and they would call me if
14 anything became available.
15   Q. Can you give me an approximate date that you
16 went in for the interview?
17   A. Maybe around the 23rd or 25th. I don't
18 remember.
19   Q. You told Sperion that you were able to work
20 at that point in time; is that correct?
21   A. I told them I was looking, yes, for a job.
22   Q. Did Sperion ever call you?
23   A. I called them a couple times to see if they
24 had anything available, and they told me they didn't

**Page 130**

1 have anything available at the time.
2   Q. I may have asked you this. I just don't
3 recall. On what day were you given the offer of
4 employment from PMA?
5   A. I don't remember the exact date that it
6 was.
7   Q. Can you give me an approximate date?
8   A. I believe it was something like within a few
9 days of my turning in my resignation.
10   Q. How long before that had you interviewed
11 with PMA?
12   A. It took maybe a day for them to get back to
13 me and tell me I had the job.
14   Q. How much time before the time they called
15 you and said you had the job had you applied?
16   A. I don't remember how long it took for them
17 to get back to me.
18   Q. Was it a week, two weeks?
19   A. It might have been a couple days.
20   Q. What's your current salary at PMA?
21   A. $10.43 an hour.
22   Q. What were you earning at Aetna when you
23 left?
24   A. Almost 14 an hour, I believe.

**Page 132**

1 ever had any other type of psychological treatment?
2   A. No.
3   Q. No other kind of counseling?
4   A. No.
5   Q. Family counseling?
6   A. No.
7   Q. Are there any monies or payments you believe
8 Aetna still owes you?
9   A. Not as far as my pay. I mean, they
10 basically paid me my pay up until I left.
11   Q. You also received a 1099-R with respect to
12 your retirement benefits; is that correct?
13   A. Yes.
14   Q. Have you ever in your life suffered from
15 depression?
16   A. No.
17   Q. Or anxiety?
18   A. No.
19   Q. Did you ask anyone at Aetna for a job
20 recommendation of any kind?
21   A. I don't believe I did.
22   Q. Did you ever apply for unemployment
23 compensation benefits?
24   A. No.