```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                         - - -

LISA BAILY,
              Plaintiff

        vs.                    NO. 02-5153

AETNA, INC.,
              Defendant

                         - - -

                         COPY


         Deposition of SUSAN WILLIAMS, taken at
the law offices of Nicholas E. Englesson, Esquire,
114 East Broad Street, Bethlehem, Pennsylvania, on
Monday, January 13, 2003, commencing at 3:02 p.m.,
before Edda Ileana Cortes, Registered Professional
Reporter and Notary Public of the Commonwealth of
Pennsylvania.


                         - - -


            FRANCES GUNKEL AND ASSOCIATES
               FREELANCE COURT REPORTERS
                  43 High Saddle Lane
                  Allentown, PA  18104
                    (610) 366-8996
```

```
                                                          10
 1  A      Employee.
 2  Q      Okay.  And describe for me the
 3  responsibilities of an HR consultant.
 4  A      Okay.  The HR consultant is someone who's --
 5  I guess the best way to describe it is a generalist,
 6  is the person on the front line in human resources
 7  who interacts directly with management and employees
 8  on issues related to compensation, benefits,
 9  employee relations, company policies and practices,
10  leadership development.  I think that's about it.
11  Q      Okay.  And was the HR department in the same
12  location where Lisa Baily worked?
13  A      Yes.  At the time, yes.
14  Q      Is it now off site?
15  A      Yes.
16  Q      Okay.  Now, did there come a time when that
17  position changed or were you always an HR
18  consultant?
19  A      Yes.  I was promoted from that position in
20  December of 2000.  And I became an employee
21  practices consultant.
22  Q      And what does that mean?
23  A      That position was more specialized in matters
24  related to employee relations, company policies and
25  practices, and employment laws.  And we consulted
```

Page 14:

1  A      Yes, there was.
2  Q      And what did that consist of?
3  A      The head of the department was in the Blue
4  Bell office. I can't give you the exact numbers,
5  but I can give you an idea. He --
6  Q      And who -- what was that person's name?
7  A      Robert Rosend.
8  Q      Okay.
9  A      He left the organization sometime last year.
10 And I'm not sure exactly when that was. But he was
11 in the Blue Bell and King of Prussia. He split his
12 time. He had a number of HR consultants -- well,
13 actually, he had two or three HR managers reporting
14 to him. And they had HR consultants dispersed
15 throughout the region at different locations.
16 Q      Okay. How about Allentown?
17 A      There was one HR consultant located in
18 Allentown.
19 Q      And who was that?
20 A      Her name was Cindy Karchner.
21 Q      Okay. And has your job with Aetna stayed the
22 same since you were promoted to employee practices
23 consultants?
24 A      It's changed. I was promoted again in April
25 of 2002 to an employee relations team leader.

Page 15:

1  Q      And what does that mean?
2  A      That means I now have employee relations
3  specialists reporting to me. I have seven of them.
4  Q      In addition to the job responsibilities that
5  you had previously?
6  A      We reorganized, so the job responsibilities
7  are a little bit different now, are more
8  specialized. But the people that report to me deal
9  directly with employees and managers in the same
10 role that the HR consultants did when we had
11 generalists in the field. They had that piece of
12 their job.
13 Q      Okay. Do you know who Lisa Baily is?
14 A      Yes.
15 Q      Did you know Lisa Baily independent of this
16 litigation?
17 A      I think I met her once at work.
18 Q      Were you in the same office location?
19 A      Yes.
20 Q      Do you remember the circumstances surrounding
21 having met her?
22 A      Very vaguely.
23 Q      What do you recall?
24 A      I recall that she and another employee
25 appeared in my doorway one day when the HR

Page 16:

1  consultant was absent. They seemed very upset about
2  a conflict that was going on in their unit. And I
3  spoke briefly with each of them. And while I don't
4  remember the detail of what was going on at the
5  time, I recall that I got permission from their
6  senior team leader to let them go home for the day
7  until one of the HR consultants could look into
8  their concerns and bring some resolution.
9            And I don't remember the details,
10 but they had a compelling reason of some sort that
11 they felt uncomfortable going back to their unit
12 until there was some intervention.
13 Q      Okay. And so the person that -- that was
14 absent that day, the HR consultant that was absent,
15 would that have been Cindy Karchner?
16 A      That's correct.
17 Q      Do you recall the name of the other
18 individual that Lisa was with?
19 A      I do now, yes. And her name is Heather
20 Roche.
21 Q      Okay. Did they tell you what the compelling
22 reason was, and I'm using those words because that's
23 what you said, why they shouldn't go back to the
24 department?
25 A      I'm sure she did, but I don't recall it.

```
                                                          18
 1  two individuals may have said to you that day?
 2  A      No.
 3  Q      Do you remember what day it was that they
 4  talked to you?
 5  A      No.
 6  Q      Do you remember what time of the day it was?
 7  A      No.
 8  Q      Do you remember how long the conversation
 9  lasted?
10  A      Probably -- I met with each of them
11  separately, as I recall, probably each of them for
12  20 to 30 minutes.  And I talked with one while the
13  other one was in the chairs outside of my office and
14  then swapped them out.
15  Q      Okay.  And you don't recall what either of
16  them said?
17  A      I don't recall the details.
18  Q      Did you make any notes of your conversations
19  with them?
20  A      I might have made notes at the time, but I
21  would have passed them on to whoever they were
22  referred to.
23  Q      Do you know who they were referred to?
24  A      As I recall, it would have been Kymberly
25  Ebert.  She was Cindy's backup.  And I think that
```

```
                                                          24
 1  you brought with you today and printed on January
 2  9th of 2003 includes 2002 updates?
 3  A     It includes the February 2002 update, yes.
 4  Q     Okay. So what has been marked as Williams
 5  Exhibit 1 may be different than what existed in 2000
 6  or 2001?
 7  A     It may, yes.
 8  Q     Do you have any personal first-hand knowledge
 9  about what changes may have been made between 2000
10  and 2002?
11  A     Yes.
12  Q     Okay. What's your knowledge?
13  A     My knowledge is there were two changes made.
14  One was that in May — I have to actually look at
15  the other document, if that's all right.
16  Q     And you're looking at what's been marked as
17  Williams Exhibit Number 2?
18  A     Yes.
19  Q     Before you go on, would you just tell me for
20  the record what that is, Williams Number 2?
21  A     Williams Number 2 is the summary of the plan
22  descriptions and employee benefits handbook that
23  describes time away from work and contains
24  information about family and medical leave.
25  Q     And this is something that's on-line?
```

25

1  A      Yes.
2  Q      That you printed on January 9th of 2003?
3  A      That's correct. And just to clarify where
4  this came from so you understand the timeliness of
5  it or the timing of it, we recently did our on-line
6  resources in April of 2002. We have not taken
7  documents off-line that were on HMR, our old
8  resource that was prior to April of 2002. So I went
9  to the old resource, HMR on-line, and I pulled the
10 documents that were in place before our change in
11 2002. So these were the documents that were most
12 likely in place at the time that she was there, to
13 the best of my knowledge. For example, you'll see
14 this document is dated copyrighted 2001. The site
15 was updated 2002. But the benefits handbook was a
16 2001 benefits handbook.
17           MS. WEITZ: She's looking at Exhibit
18 2.
19           THE WITNESS: Exhibit 2, page 12 of
20 12. You'll see the dates at the end of the
21 document.
22 BY MS. NENNI:
23 Q      If the site was updated February of 2002 --
24 A      January --
25 Q      -- can you be certain that there weren't

26

1  changes made to the Aetna handbook that was
2  copyrighted in 2000?
3           MS. WEITZ: I think we're looking at
4  different documents.
5           MS. NENNI: No, it's the same thing.
6           THE WITNESS: Yes.
7           MS. NENNI: It's the same thing.
8           THE WITNESS: They could -- if this
9  was updated, there could have been changes to the
10 health benefit. There could have been changes to
11 relief that would have prompted that. But to my
12 knowledge, the only changes to family and medical
13 leave in 2002 were -- I just need to find it
14 briefly, one had to do with people who had limited
15 leave protection for first-year employees who
16 weren't covered under family medical leave time. We
17 used to extend 13 weeks of job protection. And on
18 February 1st of 2002 we changed that and said that
19 we were not going to require managers to do that
20 anymore.
21           The other change that I recall is
22 that at some point in time we -- and this is weird
23 because we're the company that we outsource to. We
24 outsource the short-term disability benefits to
25 Aetna disability benefits. Now, it's still within

27

1  Aetna, but it's not, you know, like a department --
2  it's not being done by Aetna human resources, just
3  the short-term disability and the long-term
4  disability claims process was outside.
5  BY MS. NENNI:
6  Q      And when would that change have occurred?
7  A      I'm thinking that occurred in early --
8  sometime in 2000. But I'm not sure exactly when.
9  And that would not have been reflected in the text
10 here because it didn't change our policy. It just
11 changed sort of where to send the forms and who was
12 going to be looking at the medical information.
13 Q      Okay. And where was it outsourced to?
14 A      Aetna disability services, which is within
15 Aetna but it's a section of Aetna that does
16 disability processing for other companies, too.
17 They're not part of our human resources, but they're
18 just claims processors, just like our health
19 insurance is done by Aetna.
20 Q      Prior to the outsourcing, would the claim for
21 medical leave be submitted to HR?
22 A      Yes.
23 Q      And that would have been in the local office?
24 A      No, it would have gone to an HR department in
25 Hartford that specialized in disability. They had

28

1  medical professionals and ADA and FMLA experts
2  there.
3  Q      How was the processing of a medical leave
4  claim handled in 2000 and 2001? If you -- and
5  that's a very general question. If -- so if we need
6  to break it down further, I'll be happy to do that.
7  But if you can answer that generally.
8  A      Okay. Let me -- probably the best way to
9  answer that would be to tell you from the employee's
10 perspective how it works.
11 Q      Okay.
12 A      Because it really didn't look any different
13 after the outsourcing. But if an employee was
14 requesting short-term disability, which was an
15 absence of more than a week, what they would do is
16 they would call an 800-number, same 800-number
17 before and after the change. And they would talk to
18 a case manager. And that person would prompt them
19 as to what medical information they needed to
20 certify the claim. And they were looking at two
21 things in the beginning, before we outsourced it.
22 The same case manager was looking at both
23 eligibility under our disability benefit plan and
24 also eligibility under employee medical leave and
25 family medical leave, well, Aetna's family medical

Page 29

```
 1  leave policy.
 2                      After the change, what would
 3  happen is that a case manager in disability
 4  services, at the same 800-number the employee would
 5  call, they would go through the same process of this
 6  is what I need from your doctor, and exchanging the
 7  same kinds of information and reviewing the medical
 8  information as the in-house people did before.  And
 9  if they made a determination that it met the
10  criteria medically for disability, and this is how
11  it works today, too, they would automatically
12  then -- or the company would automatically apply
13  family medical leave protection, provided the
14  employee met all the other employability criteria,
15  being at the company for at least a year, working at
16  least 1,000 hours in the prior year, and not having
17  exhausted their bank of time, which was 16 hours in
18  any rolling 12-month period.  So the employee
19  initially just makes a phone call.  It can all
20  happen for disability related leave.
21                      In the old days before the
22  outsourcing, if the employee's leave was denied
23  under our short-term disability policy, the same
24  case manager would review it for eligibility under
25  the Family Medical Leave Act.  In the new world,
```

Page 30

```
 1  because it's sort of two separate issues and the
 2  case managers don't have expertise on family and
 3  medical leave, if the employee -- if their
 4  short-term disability claim was denied, the employee
 5  is instructed then to apply for employee medical
 6  leave separately.  And that goes to our
 7  much-smaller-now team of HR people who specialized
 8  in family and medical leave and ADA and have some
 9  medical credentials.  And they review it under the
10  criteria of family medical leave, which sometimes is
11  less stringent than our disability plan.
12                      So they would review it, either
13  the disability area or the total health and
14  disability services area, which is our in-house HR
15  area, look at the medical criteria, and they let the
16  supervisor know it either meets or does not meet the
17  criteria.  And then the supervisor gets that
18  information, checks eligibility, and gives the
19  employee an acknowledgement as to whether the leave
20  is approved or denied based on eligibility and
21  medical certification.
22  Q      In 2000 and 2001 was there a person or
23  persons to whom an employee would have spoken?
24  A      No.
25  Q      In 2000 and 2001, was it Aetna's practice
```

Page 31

```
 1  that an employee would first apply for short-term
 2  disability benefits?
 3  A      If it was a leave that wasn't intermittent or
 4  was more than a week.
 5  Q      And what are the eligibility requirements for
 6  short-term disability?
 7  A      The eligibility requirements for short-term
 8  disability were that you had to work for the
 9  company -- you became eligible the first of the
10  month following the first date of employment.  In
11  2002 there may not have been that waiting period,
12  but I'm not 100 percent sure.
13  Q      I'm only interested in 2000, 2001.
14  A      Right.  I'm not sure about 2000 when we -- at
15  some point during that period we changed it from
16  immediate eligibility after employment to
17  eligibility after the first of the month following
18  your date of employment.
19  Q      And that would have occurred in 2000 or 2001?
20  A      Yeah.
21  Q      So it was either?
22  A      Sometime during that period, yes.
23  Q      So it was either one month after --
24  A      Exactly.  And I'm not sure what the medical
25  criteria are.  But essentially, any full-time
```

Page 32

```
 1  employee who works more than 15 hours a week is
 2  eligible for disability benefits.
 3  Q      Any other criteria?
 4  A      Medical criteria that -- I don't know what
 5  they are, though.
 6  Q      Other than medical?
 7  A      Not that I'm aware of.  I had have to look at
 8  the policy and see.
 9  Q      So if you're a full-time employee working
10  more than 15 hours per week, unless you don't meet
11  the medical criterion, if your illness is expected
12  to last more than a week, you should qualify for
13  short-term disability?
14  A      Yes.
15  Q      If you don't qualify for disability, you're
16  then -- the employee is then instructed to make an
17  FMLA leave claim?
18  A      If they want the job protection that they
19  would receive under FMLA, we let them know that
20  that's still possible and that they should, in fact,
21  with their acknowledgement letter -- they usually
22  get a letter that says your disability claim was
23  denied.  And based on this denial, they talk to them
24  about what's going to happen in terms of being paid,
25  you know, if they have time left or if they will go
```

**33**

1  on an unpaid status and what they need to do if they
2  believe the leave qualifies under the Aetna family
3  medical leave policy. And I believe the forms are
4  attached, but I don't know because I've never had to
5  send one out myself.
6  Q    Okay. So the FMLA leave claim gives them job
7  security?
8  A    Right. Well, it gives them two things, one,
9  it protects them from being replaced while they're
10 absent; and two, it protects them from having their
11 absence used toward any disciplinary action under
12 any attendance policies. So we make sure there's no
13 consequence, no bonus decision that's adverse based
14 on their leave, or any other negative consequence if
15 they get the protection.
16 Q    And who is an eligible employee for purposes
17 of Aetna's FMLA leave policy?
18 A    An employee with at least a year of service
19 who has worked at least 1,000 hours in the prior
20 year. I'd have to refer to the policy to see if
21 there's any minimum number of hours per year worked,
22 you know, in the current year. An employee who has
23 not exhausted their 16 weeks of time in the rolling
24 12-month period and who meets the medical criteria.
25 Q    Do you personally know whether as of August

**34**

1  2nd, 2001, Lisa Baily would have been an employee
2  eligible to receive short-term disability benefits
3  if her medical leave met her medical criteria?
4  A    Yes.
5  Q    She would have?
6  A    Yes.
7  Q    Do you know whether as of August 2nd, 2001,
8  Lisa Baily would have met the requirements and be an
9  eligible employee for purposes of Aetna's FMLA leave
10 policy?
11 A    I'll tell you which criteria I do know. I
12 know she was there for more than a year. And I know
13 that she worked at least 1,000 hours the prior year.
14 But I don't know if she had used up her time
15 previously or not.
16 Q    Okay. But that would be the one remaining
17 factor, was whether or not she used up that 16-week
18 rolling bank of time?
19 A    That's correct, and the medical criteria.
20 Q    Does Aetna have any other unpaid medical
21 leave of absence or just general leave of absence
22 benefits available or options available?
23 A    We don't provide job protection unless it's
24 like an extended leave to meet an ADA requirement of
25 some sort. The other thing that we do provide is if

**35**

1  an employee is a denied status, we allow them up to
2  60 days of unpaid leave to pursue an ERISA appeal.
3  And if there's an appeal that's active under way at
4  the end of 60 days, we'll extend it and keep
5  reviewing those extensions until the ERISA claim has
6  been resolved.
7  Q    Do you personally or from any conversations
8  you may have had with anyone other than your lawyer
9  have any knowledge or information about what
10 happened with respect to Lisa Baily's request for
11 medical leave?
12 A    No, I don't.
13 Q    If Lisa -- I want you to make an assumption.
14 If Lisa Baily was, in fact, told that she could not
15 apply for FMLA leave until disability approved her
16 claim, would you agree with that or disagree with
17 that statement?
18         MS. WEITZ: I'm just going to object
19 for the record.
20         MS. NENNI: That's fine.
21         THE WITNESS: Can you ask it again? I
22 just want to make sure I understand it.
23 BY MS. NENNI:
24 Q    Sure. I want you to assume that Lisa Baily
25 was told that until disability approved her claim,